**WALK-IN MEDICAL CENTERS, INC., Plaintiff,**

v.

**BREUER CAPITAL CORPORATION, Defendant.**

No. 84 Civ. 730.

United States District Court, S.D. New York.

Dec. 31, 1986.

Whitman & Ransom, Michael S. Press, New York City, for plaintiff.

Parker Chapin Flattau & Klimpl, Martin G. Bunin, New York City, for defendant.

OPINION

CEDARBAUM, District Judge.

CONCLUSIONS of LAW and FINDINGS of FACT and JUDGMENT

THE COURT: At this time, I should like to announce my conclusions of law, my findings of fact and the judgment in this case.

I adopt and incorporate into my final decision the carefully reasoned opinion of Judge Carter, dated February 24, 1986, denying the parties' cross-motions for summary judgment in this case. (See Appendix.)

The only factual issue left open by Judge Carter was the intention of the parties as to the meaning of "adverse market conditions" as that term is used in paragraph 10(b)(vii) of the firm commitment underwriting agreement in this case.

After examining all of the exhibits in evidence, including the affidavits of the experts, and after listening to the testimony of the principal of the plaintiff and the president of the defendant, and portions of their previous testimony before the Securities and Exchange Commission, and by way of deposition, and after observing the demeanor of these witnesses on both direct and cross-examination, and carefully considering the plausibility and credibility of their testimony, and on the basis of the findings of fact which follow, I have concluded that defendant's termination of the

underwriting agreement in this case was not justified under the "market out" clause and constituted a wrongful refusal to pay for plaintiff's securities in accordance with the terms of the agreement.

I turn now to the findings of fact.

## FINDINGS OF FACT

First, the uncontested facts.

The parties agree that the following facts are not in dispute in this action:

1. Plaintiff Walk-In is a corporation duly organized and existing under the laws of the State of Florida with its principal office and place of business located in Clearwater, Florida.

2. Defendant Breuer Capital is a corporation duly organized and existing under the laws of the State of Colorado with its principal office and place of business located in Aurora, Colorado.

3. At all times relevant to the action, Walk-In was engaged in the business of establishing, developing and administering centers primarily in Florida which offer medical services to the public for the diagnosis and treatment of nonemergency illness or injury.

4. At all times relevant to the action, Breuer Capital, was and is an investment firm and broker-dealer registered with the United States Securities and Exchange Commission.

5. On or about August 11, 1983, Breuer Capital executed, in New York City, a Letter of Intent to act as the managing underwriter in connection with a proposed firm commitment public offering of 500,000 shares of Walk-In's common stock.

6. The Letter of Intent expressed the understanding that "... Breuer Capital Corporation ("BCC") shall underwrite on a firm commitment basis ... 500,000 shares of (Walk-In's) common stock ..." The letter stated that it would be Walk-In's obligation to bear the expenses of the offering, and in that connection, the letter stipulated that Walk-In would pay Breuer Capital, on a nonaccountable basis, $20,000 upon Breuer Capital becoming a member of the

NASD, subject to the understanding that "... if the underwriters do not or fail to enter into the proposed underwriting agreement, and the reasons therefor are reasonably related ... to *adverse market conditions* ..., BCC may retain such portion of the $20,000 payable to BCC upon BCC becoming a member of the NASD as shall equal actual expenses incurred by BCC ..." The letter also obligated Walk-In to pay Breuer Capital all of its Blue Sky counsel fees, expenses and Blue Sky filing fees in the event that Breuer Capital was unable to enter into the proposed underwriting agreement on account of "... *adverse market conditions* ..." (emphasis supplied.)

7. On January 18, 1984, Breuer Capital executed, in New York City, a firm commitment underwriting agreement, pursuant to which Breuer Capital agreed to purchase from Walk-In and Walk-In agreed to sell to Breuer Capital 500,000 shares of Walk-In's common stock at a purchase price of $5.40 per share with an option granted to Breuer Capital to purchase at the same price up to an additional 75,000 shares to cover over-allotments. Breuer Capital agreed in the Underwriting Agreement to make a public offering of Walk-In's common stock.

8. Pursuant to its terms, the Underwriting Agreement was to be "governed by and construed and enforced in accordance with the laws of the State of New York."

9. Paragraph 10(b) of the Underwriting Agreement, commonly known as a "market out" clause, provided:

"You shall have the right to terminate this Agreement at any time prior to the closing date (i) if any domestic or international event or act or occurrence has materially disrupted, or in your opinion will in the immediate future materially disrupt, security markets; or (ii) if trading on the New York Stock Exchange, the American Stock Exchange, or in the over-the-counter market shall have been suspended, or minimum or maximum prices for trading shall have been fixed,

or maximum ranges for prices for securities shall have been required on the over-the-counter market by the NASD or by order of the Commission or any other government authority having jurisdiction, or (iii) if the United States shall have become involved in a war or major hostilities; or (iv) if a banking moratorium has been declared by a New York State or federal authority; or (v) if a moratorium in foreign exchange trading by major international banks or persons has been declared; or (vi) if the Company or any of its future subsidiaries shall have sustained a loss material or substantial to the Company and its subsidiaries, if any, taken as a whole by fire, flood, accident, hurricane, earthquake, theft, sabotage or other calamity or malicious act which, whether or not such loss shall have been insured, will, in your opinion, make it inadvisable to proceed with the delivery of the Shares; or (vii) *if there shall have been such change in the conditions or prospects of the Company and its subsidiaries, if any, taken as a whole, or such adverse market conditions as in your judgment would make it inadvisable to proceed with the offering, sale and delivery of the shares.*" (Emphasis supplied.)

10. From January 10, 1984 to January 18, 1984, the Dow Jones Industrial Average declined from 1295.44 to a close of 1269.37.

11. On January 18, 1984, at approximately 3:00 p.m., Eastern Standard Time, the Registration Statement became effective and Breuer Capital commenced the initial offering of 500,000 shares of Walk-In stock.

12. The parties agreed that the closing of the Underwriting Agreement, originally scheduled for January 30, 1984, be accelerated to January 25, 1984.

13. The following are the closing quotes for the Dow Jones Industrial Average for the period from January 18, 1984 to January 24, 1984, as reported in *The New York Times* and in *The Wall Street Journal:*

| DATE | CLOSING |
|------|---------|
| January 18 (Wed.) | 1,269.37. |
| January 19 (Thurs.) | 1,266.02. |
| January 20 (Fri.) | 1,259.11. |
| January 23 (Mon.) | 1,244.45. |
| January 24 (Tues.) | 1,242.88. |

14. The following are the closing quotes for the NASDAQ–OTC market for the period from January 18, 1984 to January 24, 1984, as similarly reported:

| | |
|------|---------|
| January 18 (Wed.) | 286.86. |
| January 19 (Thurs.) | 287.21. |
| January 20 (Fri.) | 286.49. |
| January 23 (Mon.) | 284.41. |
| January 24 (Tues.) | 280.20. |

15. During the afternoon of January 23, 1984, Faye Breuer informed George Resch that, based upon advice received from its counsel, Breuer Capital was claiming "adverse market conditions" and was forthwith terminating the Underwriting Agreement pursuant to paragraph 10(b)(vii).

16. The underwriting agreement was terminated by Breuer Capital as of the close of the Market on January 23, 1984.

17. By a telegram transmitted to Walk-In at or around 9:00 a.m. on January 24, 1984, and by a confirming letter dated the same date, Breuer Capital notified Walk-In that because of alleged "adverse market conditions" it had elected to terminate the Underwriting Agreement and was therefore refusing to proceed with the offering, sale and delivery of Walk-In's common stock.

18. Between January 18, 1984 and January 23, 1984, Breuer Capital secured firm offers for 601,500 shares of Walk-In stock.

That concludes the findings of fact that the parties agree are not in dispute in this action.

The following are my findings of fact, and I continue with the following numbering:

19. Before the Letter of Intent was executed by the parties, a meeting was held at the offices of Whitman & Ransom on August 10, 1983, in New York City. In attendance at that meeting were George Resch, Donald Parson, Walk-In's counsel, Faye Breuer, and Lawrence Fisher,

Breuer's counsel. The purpose of the meeting was to review a draft of the proposed Letter of Intent in order to make final changes and modifications before it was signed.

20. Resch testified, and I find his testimony credible, that during the meeting, in the course of discussing paragraph 4 of the Letter of Intent, Parson asked Fisher what he meant by the term "adverse market conditions." Fisher responded that that language was in all of his agreements. Parson then asked whether the decline by approximately 20 points in the Market in the last few days was the type of "adverse market conditions" contemplated by the agreement. Resch testified that Breuer responded that that was not what the language meant; rather, that adverse market conditions meant a market in which underwriters could not sell their shares.

21. There was no discussion by the parties of the meaning of "adverse market conditions" as used in paragraph 10(b)(vii) of the Underwriting Agreement.

22. Breuer testified both at trial and under oath before the Securities and Exchange Commission that her understanding of adverse market conditions is "where the market is going down, there are no buyers, everyone wants to sell, everyone is losing money." Breuer also testified before the SEC, and her testimony was read into the record at trial:

"Q. Are those adverse market conditions with respect to a particular stock or in general?

"A. I think it's broad-based.

"Q. So you're talking about adverse market conditions affecting the securities markets in general?

"A. In general.

"Q. As opposed to the market conditions affecting a particular stock?

"A. Affecting a particular stock, yes."

23. The general market decline during the period from January 18, 1984, through January 23, 1984, was neither drastic nor extraordinary. In fact, the NASDAQ–OTC market for the period declined approximately 7 points.

24. Plaintiff's expert, Howard L. Blum, Jr., stated in his affidavit, which by stipulation of the parties was treated as trial testimony:

"There was significant equity underwriting being done during the period of the decline, as confirmed by *Corporate Financing Week*, which shows that there were seven equity offerings which went effective on January 18, 1984, and of the seven, six advanced in aftermarket trading during the following week."

He also testified, on the basis of a study that he had conducted, that:

"Market declines of like or greater proportions have occurred at least 71 times during the course of the last 11 years...."

25. I found the opinions of Blum persuasive and well-supported.

26. Breuer testified before the Securities and Exchange Commission on February 1, 1984, one week after the events of January 23, 1984, with respect to the events of that day:

"Q. Were you keeping track of the performance of Walk-In Medical?

"A. Yes.

"Q. How did it perform?

"A. It sat very, very quiet most of the morning and we bought no stock. And then I made a terrible mistake—I went to lunch. For 30 minutes. I guess that was a mistake because when I came back the stock was at 4⅜.

"Q. Did you try to find out why it had dropped so quickly?

"A. Yes; I was on the phone the minute I walked in the door. They had no quote machines in their office so I was on the phone with my trader to get—just to get the quote and see what was going on.

"Q. Was that Mr. Pasternak?

"A. This is Mr. Pasternak at Troster Singer. And I had checked out just as I had walked out the door; I said, 'I'm just going to be gone shortly.' I did not leave

any open orders with him. I said I'd be back shortly and then I ran right through the door and called him, and he said, 'We're really getting hit.'"

27. I am satisfied, after listening to all of the testimony and weighing the credibility of the witnesses, that Mrs. Breuer was worried that she would not get paid by those who had made commitments to purchase the Walk-In shares, and that defendant's decision to cancel the underwriting was not based on an evaluation of general market conditions but on the decline in the price in the aftermarket of Walk-In stock.

28. I am also satisfied that, under any reasonable interpretation, a decline in the aftermarket price of Walk-In stock does not constitute "adverse market conditions" within the meaning of paragraph 10(b)(vii) of the firm commitment underwriting agreement in this case.

29. I find that defendant's termination of the underwriting agreement was not justified by any of the reasons set forth in the "market out" clause and constituted a breach of the agreement.

I turn separately to the question of damages.

### DAMAGES

As stipulated by the parties, the firm commitment underwriting agreement in this case was a contract to sell to defendant 500,000 shares of Walk-In stock at the price of $5.40 per share.

Plaintiff seeks damages under Section 8–107 of the New York Uniform Commercial Code. Section 8–107(2) provides:

"Where, pursuant to a contract to sell or a sale, a security has been delivered or tendered to the purchaser, and the purchaser wrongfully fails to pay for the security according to the terms of the contract or the sale, the seller may as an alternative to any other remedy recover the agreed price of (a) certificated securities accepted by the buyer; and (b) uncertificated securities which have been transferred to the buyer or person designated by the buyer. This subsection does not affect the remedy of a seller if the security has not been delivered or tendered."

Under this provision, plaintiff may recover the agreed price of the securities as an "alternative" to any other remedy. The only case interpreting this provision which the parties have cited is *Bache & Co., Inc. v. International Controls Corp.*, 339 F.Supp. 341 (S.D.N.Y.), *aff'd*, 469 F.2d 696 (2d Cir.1972). That case directly supports plaintiff's right to recover the agreed price as the measure of its damages.

Defendant seeks to distinguish *Bache* and argues that Section 8–107 is not an alternative remedy in this case because Section 8–107(2) was amended in 1982, after the decision in the *Bache* case. Defendant argues that the amendment imposed a new requirement of actual acceptance by or delivery to the buyer as a prerequisite to the seller's right to recover the "agreed price." Defendant offers no reason for such a substantive change and no legislative history or purpose to explain it. On the contrary, the legislative history of this amendment contradicts the defendant's contention.

Chapter 928 of the laws of 1982, the statute that amended Section 8–107(2) between the time of the Bache decision and the trial of this case, was an act to amend Articles 8 and 9 of the UCC and certain other sections of the New York Business Corporation Law for the purpose of dealing with uncertificated securities. The legislative intention which was carried out in that statute was to enact comprehensive technical conforming amendments "in relation to certification of securities." The amendment of Section 8–107(2), which postdated the Bache decision, had no substantive purpose, and plaintiff's right to elect the remedy provided by Section 8–107(2) is not affected by the technical amendments of 1982. Since an action for the price under Section 8–107(2) is a remedy to enforce the contract in accordance with its terms, plaintiff must be treated as holding 500,000 shares of Walk-In stock for defendant, and should deliver those shares to defendant

upon receipt from defendant of the contract price. In addition, in accordance with paragraph 6(b) of the contract, defendant is entitled to receive $90,000 from plaintiff.

Therefore, judgment is hereby entered for plaintiff and against defendant in the amount of $2,610,000 plus interest at 9% from January 25, 1984, together with the costs of this action.

SO ORDERED.

## APPENDIX

## OPINION

Feb. 24, 1986

ROBERT L. CARTER, District Judge.

Plaintiff Walk-In Medical Centers ("Walk-In"), a Florida corporation which establishes, develops and administers medical service centers for the diagnosis and treatment of non-emergency illness or injury, brought this diversity action against defendant underwriter Breuer Capital Corporation ("Breuer"), a Colorado investment banking firm and broker-dealer registered with the United States Securities and Exchange Commission ("SEC"), alleging that Breuer's termination of a firm commitment underwriting agreement, whereby Breuer had agreed to publicly offer 500,000 shares of Walk-In common stock, constituted a breach of the agreement.[1]

Defendant moves for summary judgment pursuant to Rule 56, F.R.Civ.P. in reliance on the agreement's "market out clause."[2] Plaintiff cross-moves for summary judgment alleging breach of contract and damages in the amount of $3,305,000.

FACTS

Breuer executed a letter of intent on or about August 11, 1983, expressing its desire to underwrite a proposed firm commitment public offering of 500,000 shares of Walk-In's common stock.[3] (*Defendant's 3(g) Statement*, Exhibit A). Walk-In then filed with the SEC a registration statement covering the proposed stock offering. When the registration statement became effective on January 18, 1984, the parties signed an underwriting agreement which provided that "subject to the terms and conditions herein set forth, the Company agrees to sell to the Underwriter and Underwriter agrees to purchase from the Company 500,000 Firm Shares at the purchase price of $5.40 per Share." (*Defendant's 3(g) Statement*, Exhibit B at 6).

Paragraph 10(b) of the underwriting agreement, commonly known as a "market out" clause, reads as follows:

[Breuer] shall have the right to terminate this Agreement at any time prior to the Closing Date (i) if any domestic or international event or act or occurrence has

---

1. The court has diversity jurisdiction over this action, pursuant to 28 U.S.C. § 1332. Venue is in this district pursuant to 28 U.S.C. § 1391(a) as the claim arose in New York City. Breuer is subject to the personal jurisdiction of the court pursuant to Section 302 NYCPLR because it has transacted business in New York.

2. A "market-out" clause typically allows the underwriter to terminate the agreement if prior to the date of public offering or the closing date, (depending upon the terms of the underwriting agreement) "any substantial change has occurred in the issuer's financial position or in existing 'operating, political, economic or market conditions' which in the judgment of the underwriters render it impracticable or inadvisable to market the securities at the specified public offering price. This clause is much broader than the traditional *force majeure* provision." 1 L. Loss, *Securities Regulation* 166 (2d ed. 1961).

3. Firm commitment underwriting, the most prevalent type of American underwriting, "assures the issuer of a specified amount of money at a certain time (subject frequently to specified conditions precedent in the underwriting contract) and *shifts the risk of the market ... to the investment bankers.*" (emphasis added) 1 L. Loss, *Securities Regulation* 163–64 (2d ed. 1961). A "best efforts" underwriting, on the other hand, usually is agreed to by companies which cannot find an underwriter who will give a firm commitment and assume the risk of distribution. In this sort of underwriting, a company must distribute its securities through underwriting firms which merely undertake to use their best efforts. The securities firm, "instead of buying the issue from the company and reselling it as principal, sells if for the company as agent; and its compensation takes the form of an agent's commission rather than a merchant's or dealer's profit." *Id.* at 171–72.

materially disrupted, or in [Breuer's] opinion will in the immediate future materially disrupt, securities markets or (ii) if trading on the New York Stock Exchange, or in the over-the-counter market shall have been suspended, or minimum or maximum prices for trading shall have been fixed, or maximum ranges for prices for securities shall have been required on the over-the-counter market by the NASD or by order of the Commission or any other government authority having jurisdiction; or (iii) if the United States shall have become involved in a war or major hostilities; or (iv) if a banking moratorium has been declared by a New York State or federal authority; or (v) if a moratorium in foreign exchange trading by major international banks or persons has been declared; or (vi) if the Company or any of its future subsidiaries shall have sustained a loss material or substantial to the Company and its subsidiaries, if any, taken as a whole by fire, flood, accident, hurricane, earthquake, theft, sabotage or other calamity or malicious act which, whether or not such loss shall have been insured, will, in [Breuer's] opinion, make it inadvisable to proceed with the delivery of the Shares; or (vii) if there shall have been such change in the conditions of prospects of the Company and its subsidiaries, if any, taken as a whole, *or such adverse market conditions as in [Breuer's] judgment would make it inadvisable to proceed with the offering, sale and delivery of the Shares.*

(emphasis added) (*Id.* at 18.) To invoke the market out clause, ¶ 10(c) of the underwriting agreement required Breuer to notify Walk-In promptly "by telephone or telegram, confirmed by letter" of its election to terminate. (*Id.* at 18).

On or about January 23, 1984, the parties mutually agreed that the closing date of the underwriting agreement, originally scheduled for January 30, 1984, would be accelerated to January 25, 1984. (*Defendant's 3(g) Statement* at ¶ 11). Prior to the new closing date, Breuer, by telegram and letter dated January 24, informed Walk-In that it was terminating the underwriting agreement "in accordance with its terms due to adverse market conditions that make it inadvisable, in Breuer Capital's judgment, to proceed with offering, sale and delivery of 500,000 shares of Walk-In's common stock." (*Defendant's 3(g) Statement*, Exhibits C, D).

During the period January 18, 1984, through January 23, 1984, the securities markets declined some 27 points as measured by the Dow Jones Industrial Average.[4] According to Breuer's President, Mildred Breuer, her decision to terminate the underwriting agreement was predicated upon "the general market conditions which then had an adverse effect on the Walk-In stock." (*Mildred Breuer Affidavit in Support of Defendant's Motion for Summary Judgment* at ¶ 9). Walk-In disputes Breuer's characterization of the market conditions on January 23 and 24, 1984, as "adverse" so as to justify Breuer's termination of the underwriting agreement.[5] (*Plaintiff's 3(g) Statement in Opposition*

---

**4.** The following are the closing quotes for the Dow Jones for the period from January 18, 1984 to January 24, 1984, as reported in *The New York Times* and in *The Wall Street Journal:*

| Date | Closing |
| --- | --- |
| January 18 | 1,269.37 |
| January 19 | 1,266.02 |
| January 20 | 1,259.11 |
| January 23 | 1,244.45 |
| January 24 | 1,242.88 |

(*Defendant's Memorandum of Law in Support of its Motion for Summary Judgment,* Exhibit A).

**5.** Although Walk-In's 3(g) statement in opposition to Breuer's motion for summary judgment alleges that the underwriting agreement was terminated on January 23, 1984, its amended complaint refers to January 24, 1984 as the date on which it was notified of the termination. Moreover, the complaint surveys the market prices in the securities market between January 18 and January 24 to conclude that there was "no drastic or unforeseeable change in the condition of the securities market generally" between those dates. Hence, for purposes of determining the existence of adverse market conditions which entitled Breuer to terminate the

to Defendant's Motion for Summary Judgment at ¶¶ 7, 9).

DISCUSSION:

Both plaintiff and defendant have annexed to their motions for summary judgment Rule 3(g) statements in which the moving parties contend there are no genuine issues of material fact to be tried. The movant has the burden of showing that there are no genuine issues of material fact. *Burtnieks v. City of New York*, 716 F.2d 982 (2d Cir.1983); 10 C. Wright & A. Miller, M.K. Kane, *Federal Practice & Procedure, Civil* § 2727 (1983 ed.).

The parties agree that the closing quotes set forth in ¶¶ 12 and 13 of defendant's 3(g) statement are accurate, and that subsection (vii) of the market out clause allowed Breuer to terminate the underwriting agreement if adverse market conditions existed prior to the closing date. However, the parties disagree as to whether the admitted decline in general market conditions constitutes "adverse market conditions."

Plaintiff argues that the parties' intent and the custom and practice in the underwriting industry dictate that the phrase "adverse market conditions"—in the context of a firm commitment underwriting— denotes "an unforeseeable and extraordinary decline in the securities market generally," (*Blum Affidavit* at ¶ 2) or "a market in which no underwriters could sell their issues." (*Resch Affidavit* at 3). In support of this view, plaintiff cites *Webster's New International Dictionary* 38 which defines "adverse" as "calamitous." (*Plaintiff's Reply Memorandum of Law in Support of Its Cross Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment* at 6).

Defendant counters that according to *Funk & Wagnalls, New Comprehensive Dictionary of the English Language*, the literal meaning of "adverse" is "unpropitious" or "detrimental." (*Mildred Breuer's Reply Affidavit Submitted in Support of Defendant's Motion for Summary Judgment* at 12). Hence, defendant argues there is no basis for the court to constrain "adverse market conditions" to denote only those unfavorable market conditions which are unforeseeable or extraordinary. Defendant asserts that if the parties had wanted to limit the type of "adverse market conditions," the parties could have inserted the words "unforseeable," or "extraordinary." In support of this argument, defendant cites other subsections of the market out clause which contain limiting words, such as the first "market out" situation which requires a "material" disruption of the securities market caused by some domestic or international event, and the sixth market out situation which requires a loss that is "material" or "substantial." (*Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment* at 11–12).

The objective of contract interpretation is to give effect to the expressed intentions of the parties. *Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 77, 430 N.Y.S.2d 179, 184 (4th Dep't 1980); 4 S. Williston, *Williston on Contracts* § 600 (3d ed. 1961). Where the language of a contract is ambiguous, a question of fact exists, *West Africa Navigation, Ltd., of Monrovia v. Ore & Ferro Corporation*, 192 F.Supp. 651, 653 (S.D.N.Y.1960) (MacMahon, J.) and summary judgment should be denied. *Boro Hall Corp. v. General Motors Corp.*, 164 F.2d 770, 771–72 (2d Cir.1947). But the preliminary determination that a contract is ambiguous is a question of law for the court, *Tokio Marine & Fire Ins. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *Sutton v. East River Savings Bank*, 450 N.Y. S.2d 460, 462, 55 N.Y.2d 550, 435 N.E.2d 1075 (1982) and the mere fact that the parties disagree on the construction of a contract does not establish ambiguity. *Freeman v. Continental Gin Company*, 381 F.2d 459, 465 (5th Cir.1967); *Cole v. Ross Coal Co.*, 150 F.Supp. 808, (S.D.W. Va.), *aff'd* 249 F.2d 600 (4th Cir.1957). However, if the "contractual language is

agreement, this court will examine the securities markets between January 18 and January 24.

susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] not proper." *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) (quoting *Aetna Casualty & Surety Co. v. Giesow*, 412 F.2d 468, 471 (2d Cir.1969)). *Holgerson v. Swan Lake Poultry Co.*, 30 A.D.2d 591, 592, 290 N.Y.S.2d 21, 23 (3d Dep't 1968).

To interpret "adverse market conditions" as any unfavorable decline in securities markets gives literal effect to the words of that phrase and is thus not unreasonable. Yet, if the parties had intended that Breuer could cite any unfavorable condition in securities markets as the basis for termination, there would have been no reason for the market out clause to list specific disruptions to securities markets as grounds for termination of the underwriting agreement; instead, the parties could simply have allowed for termination, "if adverse market conditions in your [Breuer's] judgment make it inadvisable to proceed with the offering, sale and delivery of the shares." Because Breuer's interpretation of 10(b)(vii) renders entirely superfluous all but one of the other six bases for termination specifically described in the market out clause,[6] such an interpretation cannot be said to be the clear and unambiguous intent of the parties.

Accordingly, plaintiff's assertion that the court should not determine the meaning of the phrase "adverse market conditions" in a vacuum, but rather should decide its meaning in light of all of the other provisions in 10(b), is reasonable. (*Plaintiff's 3(g) Statement in Opposition to Defendant's Motion for Summary Judgment* at ¶ 3). Plaintiff argues that given the "litany of catastrophic events set forth in [10(b)], the rule of *ejusdem generis* ... supports Walk-In's position that the term 'adverse market conditions' was intended to apply to a situation as calamitous as the others enumerated in the 'market out'

clause." (*Plaintiff's Reply Memorandum of Law Submitted in Support of Its Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment* at 6).

Courts have long adopted a rule of construction that "when a particular class is spoken of, and general words follow, the class first mentioned is to be taken as the most comprehensive, and the general words are restricted to those of the same kind (*ejusdem generis*)." *Bers v. Erie R.R. Co.*, 225 N.Y. 543, 546, 122 N.E. 456 (1919). *See, e.g., F.W. Fitch Co. v. U.S.*, 323 U.S. 582, 587, 65 S.Ct. 409, 412, 89 L.Ed. 472 (1945) ("a transportation, delivery, insurance, installation, or other charge"); *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837 (2d Cir.1975) (court narrowly construed the phrase "or for any similar or dissimilar reasons" that followed a list of *force majeure* events in light of the more specific terms preceding it); *Baum v. Investors Diversified Services, Inc.*, 409 F.2d 872 (7th Cir.1969) ("goods, wares, merchandise, machinery, supplies, or other commodities").

Although the principle of *ejusdem generis* is "merely an aid to interpretation when the intention is not otherwise apparent[, and i]t never controls when it clearly appears from the instrument that no such limitation was intended," *Brooklyn City Railroad Co. v. Kings County Trust*, 214 A.D. 506, 511, 212 N.Y.S. 343, 347 (2d Dep't 1925), *aff'd*, 242 N.Y. 531, 152 N.E. 414 (1926) (per curiam), an interpretation that gives a reasonable and effective meaning to all the terms of a contract is preferable to one that leaves a part unreasonable or of no effect. *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir.1985); *Browning-Ferris Industries of New York, Inc. v. County of Monroe*, 478 N.Y.S.2d 428, 430, 103 A.D.2d 1040 (4th Dept.1984), *aff'd*. 64 N.Y.2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985); Restatement (Second) of Contracts § 203(a) (1981). Hence,

---

**6.** 10(b)(vi) is a *force majeure* clause which allows Breuer to terminate the underwriting agreement in the event that any calamitous act

befalls Walk-In, regardless of the condition of the securities market generally.

applying the principle of *ejusdem generis* here would be neither inappropriate nor unreasonable since it seems unlikely that the parties could have intended the phrase "adverse market conditions" to swallow up specified material events affecting the securities markets, thereby allowing Breuer to terminate its firm commitment underwriting agreement whenever the market declined.

Moreover, the SEC's Division of Market Regulation has taken the position that market out clauses which permit an underwriter to terminate its obligation to purchase the offered securities from the issuer based upon "the occurrence of nonmaterial events affecting the issuer or the securities markets in general ... *are inappropriate in the context of a firm commitment underwriting.*" (emphasis added) *The First Boston Corporation*, SEC No Action Letter No. 85-415 (Sept. 3, 1985). Such clauses would "effectively place the risk of the success of the offering upon the issuer and result in the underwriter participating upon a 'best efforts' basis." (*Id.*) Because Breuer's interpretation of "adverse market conditions" to mean a nonmaterial decline in the market is inconsistent with the parties' intent to enter into a firm commitment underwriting, (*Press Affidavit*, Exhibit A, at 23–24,), it is reasonable to interpret the phrase "adverse market conditions" found in 10(b)(vii) as only covering unstated material events causing drastic or extraordinary declines in the securities markets generally.[7] Since there is more than one reasonable interpretation of 10(b)(vii), there are fact questions to be determined by a jury

as to the coverage of the 10(b)(vii) termination clause.[8]

George Resch, president of Walk-In, in support of plaintiff's position on the motions for summary judgment, asserts that prior to entering into the underwriting agreement, he and Walk-In's counsel, Donald Parson, met on August 10, 1983, with Mildred Breuer and Breuer's counsel, Larry Fisher, to review a draft of the proposed letter of intent at which time the parties discussed the meaning of the term "adverse market conditions." (*Resch Affidavit* at 3). According to Resch, Parson cited the fact that the stock market had declined by more than 20 points on August 8, and inquired whether that kind of decline was covered by the term "adverse market conditions." Mildred Breuer allegedly answered that that was not what the language meant, but rather " 'adverse market conditions' was a market in which no underwriters could sell their issues." (*Id.* at 3). Mildred Breuer's affidavit, in contract, asserts that "the phrase 'adverse market conditions' was not discussed in relation to the underwriting agreement or with respect to the public offering and quite simply, the term was to receive its ordinary everyday dictionary meaning." (*Breuer's Reply Affidavit Submitted in Support of Defendant's Motion and in Opposition to Plaintiff's Cross-Motion* at 4). When Breuer testified before the SEC on February 1, 1984, in regard to the Walk-In underwriting, she stated that she not know the market out clause was in the Walk-In underwriting agreement, because she did not

---

7. Consistent with the SEC's view of market out clauses contained in firm commitment underwriting agreements, Walk-In argues that Breuer's interpretation of the phrase "adverse market conditions" "would leave issuers at the whim and caprice of underwriters, and leave the market place uncertain as to whether any underwriting could or would be successfully completed ... such a definition [of adverse market conditions] would frustrate the stated purpose of a firm commitment underwriting and, indeed, carried to its logical conclusion, would do away with the very concept of the firm commitment underwriting." (*Plaintiff's*

*Reply Memorandum In Support of Its Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment* at 5–6).

8. Where there is ambiguity, parol evidence of the subjective intent of the parties is admissible where such extrinsic evidence does not change or modify the agreement, but only defines the subject-matter to which it was meant to apply. *Rotberg v. Dodwell & Co.*, 152 F.2d 100, 101 (2d Cir.1945); *accord, Schine v. Schine*, 250 F.Supp. 822, 826 (S.D.N.Y.1966) (Weinfeld, J.)

read the agreement before she signed it. (*Press Affidavit,* Exhibit A at 115). However, at that same hearing, Breuer explained that she understood "adverse market conditions" to mean "the market is going down, they're no buyers, everyone wants to sell, everyone is losing their money." (*Id.* at 26).

In support of Walk-In's position, there is the fact that by January 18 the Dow Jones industrial average had dropped 26.07 points from its all time high reached earlier on January 10, 1984. Defendant admits that in mid-January of 1984, there was a deterioration in general market conditions. (*Breuer's Affidavit in Support of Defendant's Motion and in Opposition to Plaintiff's Cross-Motion* at 8). It is difficult to believe that Walk-In would have signed the letter of intent or the actual underwriting agreement without first having determined that "adverse market conditions" did not include market declines of the sort that the market was experiencing on August 10 or on January 18.[9] It is also incredulous that Mildred Breuer first learned of the existence of the market out clause when she desired to terminate the agreement, as it seems unlikely that she would sign her first underwriting agreement unread.[10]

On the other hand, there was a decline in general market conditions, and if "adverse" was meant to mean merely unfavorable market conditions, Breuer had the right to exercise its subjective judgment as to the advisability of terminating the underwriting agreement.

Because there are substantial questions as to the parties' intent regarding the meaning of 10(b)(vii), both motions for summary judgment are denied.

IT IS SO ORDERED.

---

**9.** According to Walk-In, the market out term "adverse market conditions" was defined satisfactorily during the August 10, 1983 meeting when the letter of intent was drafted; hence, Walk-In did not deem necessary any further negotiations on that term. (*Plaintiff's Reply Memorandum of Law in Support of Its Cross-Motion for Summary Judgment and in Opposi-* *tion to Defendant's Motion for Summary Judgment* at 5, n. 2)

**10.** Breuer testified before the SEC that the Walk-In Medical Center underwriting would have been her company's first underwriting. (*Press Affidavit,* Exhibit A at 12).