**WALK–IN MEDICAL CENTERS, INC., Plaintiff,**

v.

**BREUER CAPITAL CORPORATION, Defendant,**

**Mildred Faye Breuer and Grant William Breuer, Garnishees.**

Civ. A. No. 90–B–567.

United States District Court, D. Colorado.

Nov. 19, 1991.

David Goldberg, Kenneth S. Kramer, Berenbaum & Weinshienk, P.C., Denver, Colo., for Walk–In Medical Centers, Inc.

F. Kelly Smith, Wheat Ridge, Colo., for Mildred Faye Breuer.

J. Bryan Howell, Mitchell & Howell, P.C., Parker, Colo., for Grant William Breuer.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BABCOCK, District Judge.

This garnishment action was tried to the court for three days beginning on October 28, 1991. The following are my findings of fact and conclusions of law.

## I.

## FINDINGS OF FACT

A. *Background, Procedure, and Parties*

Plaintiff, Walk–In Medical Centers, Inc. (Walk–In), sued defendant Breuer Capital Corporation (BCC) in the U.S. District Court for the Southern District of New York on January 31, 1984 for breach of a firm commitment underwriting agreement. On December 30, 1986, that court awarded plaintiff damages of $2,610,000.00, plus interest from January 25, 1984. *See, Walk–In Medical Centers, Inc. v. Breuer Capital Corporation*, 651 F.Supp. 1009 (S.D.N.Y.1986). Mildred Faye Breuer (Faye Breuer) and Grant William Breuer (G.W. Breuer), garnishees here, were not parties to the New York action. The judgment entered against BCC was affirmed by the Second Circuit Court of Appeals. *See, Walk–In Medical Centers, Inc. v. Breuer Capital Corporation*, 818 F.2d 260 (2d Cir. 1987).

Walk–In lodged the New York judgment against BCC with the U.S. District Court for the District of Colorado in February 1988. In September 1988, Walk–In served writs of garnishment on Faye Breuer and G.W. Breuer seeking to recover BCC's assets. The Breuers denied that they held any BCC asset or owed any money to that corporation. Walk–In traversed the Breuers' answers to the garnishment writs.

Walk–In is a Florida corporation. Its principal office and place of business is at Clearwater, Florida. Walk–In is in the business of establishing, developing, and administering public medical centers for the diagnosis and treatment of non-emergency illness or injury.

BCC was formed as a subchapter S corporation on April 1, 1983 under the laws of Colorado. It was an investment firm and broker-dealer registered with the U.S. Securities and Exchange Commission (SEC) and with the National Association of Securities Dealers (NASD). At all relevant times, BCC was in compliance with all SEC and NASD regulations and net capital requirements.

Faye Breuer was BCC's sole shareholder. She was also its president, treasurer, director, registered agent and principal. G.W. Breuer has been married to Faye Breuer for 18 years. He was never an officer, director, shareholder, agent, employee, principal of or consultant to BCC.

### B. *The Underwriting and Temporary Subordinated Loan*

On August 11, 1983, BCC executed in New York City a letter of intent to act as underwriter on a firm commitment basis for the public offering of 500,000 shares of Walk–In common stock. A "firm commitment" underwriting requires the broker-dealer itself to purchase all unsold shares at the offering price.

To meet SEC and NASD net capital requirements to proceed with this underwriting, Faye Breuer drew down $900,000 on her joint line of credit with G.W. Breuer at Mercantile National Bank in Dallas, Texas. Faye Breuer then loaned the money to BCC on January 17, 1984 under a temporary subordinated loan agreement approved by the NASD. The loan had a scheduled maturity date of January 30, 1984. As the lender, Faye Breuer expressly agreed:

> that the obligations of the Broker–Dealer under this Agreement with respect to the repayment of principal and interest shall be and are subordinate in right of payment and subject to the prior payment or provision for payment in full of all claims of all other present or future creditors of the Broker–Dealer arising out of any matter occurring prior to the date of [maturity].

On January 18, 1984, Walk–In and BCC executed the firm commitment underwriting agreement in which BCC agreed to sell 500,000 Walk–In shares at $5.40 a share. The agreement contained a "market out" clause which entitled BCC to cancel its obligations upon the occurrence of certain adverse market conditions. The underwriting was originally set to close on January 30, 1984, but all parties agreed to accelerate the closing to January 25, 1984.

At a January 23, 1984 meeting, Ray Dirks, a friend of the Breuers and a broker-dealer himself, told George Resch, president of Walk–In, that BCC would exercise the market-out clause and terminate the underwriting. This action was taken on advice of BCC's attorney. The meeting took place in Tampa, Florida and both Faye and G.W. Breuer were present. After the announcement, G.W. Breuer explained BCC's position to George Resch and G.W. Breuer attempted to negotiate a resolution of the problem.

Walk–In demanded performance on January 25, 1984. BCC failed to perform and Walk–In filed suit on January 31, 1984. Both Breuers knew of the lawsuit shortly after it was filed. On June 8, 1984, Faye Breuer and BCC received their attorney's opinion that BCC had not breached the Walk–In underwriting agreement and that Walk–In would probably not prevail in the New York lawsuit. Until judgment was announced on December 30, 1986, Faye Breuer believed in good faith that BCC would win the New York lawsuit. However, the judgment determined that the market-out clause in the underwriting agreement did not insulate BCC from its breach of that contract.

In early February, 1984, the SEC and NASD investigated the failed underwriting but neither organization issued formal findings or conclusions. BCC was never sanctioned for its walk out from the Walk–In underwriting.

During this time, G.W. Breuer was under pressure from the Mercantile National Bank to pay off the $900,000 draw on the Breuer's joint line of credit because the fall in the price of oil had decreased the value of his collateral for the line of credit. Faye Breuer knew of this pressure on her husband.

In early February, 1984, BCC sought permission from the NASD to repay the $900,-000 subordinated loan to Faye Breuer. The NASD initially refused permission, but later that month NASD's position became neutral on whether the loan could be repaid.

BCC paid out $600,000 to Mercantile National Bank to reduce the Breuer's line of credit on February 22, 1984. Subsequently, two more installments of $200,000 and $100,000 were paid to that bank in May and August respectively.

On February 24, 1984, BCC elected to report to NASD under the alternate net capital requirements of the SEC and NASD. The alternate net capital rules did

not require BCC to "book" contingent liabilities and increased its net capital requirement from $25,000 to $100,000. Broker-dealers are free to make this election. There is no persuasive or satisfying evidence that BCC ever violated either its net capital requirements or any NASD regulation by repayment of the temporary subordinated loan.

However, I find that Walk–In was a "creditor" within the meaning of the temporary subordinated loan agreement because its claim arose at the failed closing on January 25, 1984, before January 30, 1984, the loan agreement's scheduled maturity date. Further, Faye Breuer then breached the terms of the loan agreement when she accepted and retained repayment of this loan before BCC made provision for payment of Walk–In's claim.

## C. *BCC Financing and Operations*

On February 22, 1984, G.W. Breuer gave Faye Breuer 1,760 shares of Digital Switch convertible subordinated debentures and 215,900 shares of Digital Switch common stock. These securities had a net margined value of $4,226,506.00. However, the securities were declining in value and G.W. Breuer had lost approximately $2 million on them before he gave them to his wife. Faye Breuer knew that her husband was losing money on these securities.

At a special meeting of the BCC board of directors on February 24, 1984, Faye Breuer stated that BCC needed more capital and she transferred the Digital Switch securities to the corporation. Next, at a special meeting of the BCC board of directors on May 11, 1984, Faye Breuer again stated that BCC was in need of additional net capital and she transferred to the corporation various securities she owned with a net value of $799,816.70. Then, on June 11, 1984, G.W. Breuer gave his wife 600,000 shares of stock in various companies. At a special meeting of the Board of Directors on that day, Faye Breuer again stated that the corporation needed to increase its net capital and she transferred the bulk of this stock to BCC.

Faye Breuer called a special meeting of the board of directors on October 19, 1984, during which she stated that BCC was no longer in need of the net capital that she had contributed. She directed that the Digital Switch shares be transferred directly to G.W. Breuer. At this time, G.W. Breuer had no right, title or claim to these securities, nor did he have any loan agreement with the corporation or his wife. Again on December 24, 1984, Faye Breuer caused the BCC board of directors to transfer additional securities to G.W. Breuer because, in her opinion, BCC was no longer in need of this contribution to its net capital. Also at this time, G.W. Breuer had no right, title or claim to these securities nor did he have any loan agreement with the corporation or his wife.

The total value of BCC capital transferred to G.W. Breuer in 1984 was approximately $1.9 million. While BCC owned these securities, the corporation paid the interest and margin calls attributable to them. There is no persuasive or satisfying evidence that the Breuers gained any tax advantage or otherwise personally benefitted from the transfer of these securities into and out of BCC.

From its inception through October 19, 1984, BCC operated with only two directors even though its articles of incorporation called for three. Until October 19, 1984, the only other director was an employee of BCC and a subordinate of Faye Breuer. At all other times, the board of directors consisted of friends, family, or business associates of Faye Breuer. Faye Breuer dominated the board and the board consistently approved her decisions.

BCC traded other securities for both Faye and G.W. Breuer's personal accounts. BCC charged them no commission or substantially reduced commissions for these trades. Faye Breuer at times paid some BCC expenses from her personal checking account.

Walk–In asserts that BCC's ledgers show that Faye Breuer received millions of dollars as "advances" from BCC. Although ledgers are in evidence, plaintiff presented no testimony, expert or other-

wise, as to the specific amounts and circumstances of these purported advances. The ledgers are voluminous and not facially clear. I do not have the expertise to interpret them to determine the amount, if any, of the advances. Therefore, I find that Walk–In has not met its burden of proof with regard to the existence and amount of the alleged advances.

BCC kept its own bank accounts, filed all required reports with NASD, employed its own accountants and counsel, and prepared annual audited financial reports. The corporation regularly acted on the advice of its counsel and accountants. BCC held regular board meetings, kept minutes, and complied with the basic corporate formalities of record-keeping. At all times, BCC's funds and Faye Breuer's personal funds were kept separate.

G.W. Breuer attended several business meetings concerning BCC's underwriting of Walk–In. He visited Walk–In's main offices and spent two days investigating its operations on behalf of his wife and BCC.

G.W. Breuer allowed BCC to pay for his travel on several occasions. He permitted BCC to use his personal credit cards for corporate expenses with the understanding that BCC would repay him for corporate charges. On December 30, 1986 he submitted an invoice to BCC for $14,775.29 as charges from 1983 through November, 1986. There is no satisfying or persuasive evidence that G.W. Breuer ever loaned moneys to BCC.

G.W. Breuer had an oral contract with BCC for the use of his mainframe computer. BCC agreed to pay $1,000 a month on an annual basis for the use of that computer. He submitted an invoice to BCC for $13,000 on December 1, 1986.

There is no satisfying or persuasive evidence that any transfer of assets out of BCC before December 30, 1986 was made with the intent to defraud, hinder or delay creditors. Nor is there satisfying or persuasive evidence that BCC was insolvent at any time before the December 30, 1986 judgment. The December 30, 1986 New York judgment, however, rendered BCC insolvent.

## D. *Post–Judgment Transfers*

When BCC ceased operations on January 9, 1987, Faye Breuer owed the corporation $33,571.50, which was listed on BCC's books as an account receivable.

After the Walk–In judgment, Faye Breuer issued BCC checks to herself totaling $180,830. Although one check for $68,215 was dated December 24, 1986, it falls sequentially between two checks written on January 2, 1987. Moreover, the check purported to be Faye Breuer's commission for a separate underwriting which did not close until December 30, 1986, six days after the check was allegedly written. Therefore, I find that this check was written after BCC's insolvency. The same reasoning and finding applies to a $2,400 check dated December 24, 1986 but falling sequentially between two checks written on January 2, 1987.

The evidence is neither satisfying nor persuasive that G.W. Breuer and other members of the Breuer family were not bona fide creditors of the corporation at the time they received checks from BCC. Likewise, the evidence does not establish that, aside from the checks from BCC to herself, Faye Breuer distributed BCC's remaining assets after it closed to persons who were not bona fide creditors of the corporation.

The evidence does not show that any transfer of BCC assets to Faye Breuer was made for the redemption of BCC stock. The evidence does not show that BCC was in liquidation or had filed a statement of intent to dissolve at the time of any transfer of BCC assets to Faye Breuer.

## II.

## CONCLUSIONS OF LAW

### A. *Jurisdiction, Venue, and Nature of Action*

The parties consent to personal jurisdiction and venue. Subject matter jurisdiction is under 28 U.S.C. § 1963.

Fed.R.Civ.P. 69 provides that post-judgment execution and garnishment remedies are governed by the practice and procedure

of the state where the execution and garnishment action is brought. Under Colo. R.Civ.P. 103 § 4, a judgment creditor can garnish a debt owed the judgment debtor by a third person. In essence, this rule places a creditor in the position of the debtor to enforce the liability of the garnishee. *See, Haselden Langley Constructors, Inc. v. Graybar Electric Co.,* 662 P.2d 1064, 1065 (Colo.1983), ("[A] judgment creditor [cannot] garnish sums which the judgment debtor himself could not recover from the garnishee"); *Shawn v. 1776 Corp.,* 787 P.2d 183, 185 (Colo.App.1989). If the garnishee denies liability to the debtor, the creditor can traverse the denial and the liability is then put at issue for trial. C.R.C.P. 103 § 8. If "the court finds the garnishee liable to the judgment debtor ..., [t]he court shall enter judgment in favor of the judgment debtor ... against the garnishee for the use and benefit of the judgment creditor." C.R.C.P. 103 § 89(b)(3)(A). *See also, Martinez v. Dixon,* 710 P.2d 498, 500 (Colo.App.1985), ("If the debtor could bring an immediate action to recover the debt from the garnishee, then the debt is due and payable within the meaning of the section").

■ A garnishment action may properly be maintained to enforce contractual liability of a garnishee to a judgment debtor for the use and benefit of the judgment creditor. *Black v. Plumb,* 94 Colo. 318, 29 P.2d 708, 710 (1934), ("The controlling characteristic of the remedy by garnishment is, that the liability of the garnishee must originate in and be dependent on, contract"). A contingent liability cannot be garnished. *Haselden Langley Constructors, Inc.,* 662 P.2d at 1065. However, a liability is not contingent within the meaning of C.R.C.P. 103 merely because a garnishee disputes whether it breached its contract with the debtor. *See, Bank of Grand Junction v. Bank of Vernal,* 81 Colo. 483, 256 P. 660 (1927); *Warner/Elektra/Atlantic Corp. v. B & R Record and Tape Merchandisers, Inc.,* 40 Colo.App. 179, 570 P.2d 1320, 1322 (1977). In any event, here, the Breuers have not asserted that the debts in issue are contingent, *cf. Haselden*

*Langley Constructors, Inc.,* 662 P.2d at 1064–65, and I conclude that they are not.

**B. Breach of Temporary Subordinated Loan Agreement**

■ Walk–In was a creditor on January 25, 1984 under the temporary subordinated loan agreement. BCC's debt to Walk–In arose out of a matter occurring before the scheduled maturity date of the loan agreement. As a matter of law, a party has creditor status before the cause of action is reduced to judgment. *Pierce v. United States,* 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697 (1921); *Thuringer v. Trafton,* 58 Colo. 250, 144 P. 866 (1914).

■ The temporary subordinated loan agreement is a fully integrated and unambiguous contract in which Faye Breuer agreed that the claims of BCC's creditors were to have been paid in full before any payment could be made to her. Therefore, I conclude that Faye Breuer breached this loan agreement when she accepted and retained the $900,000 without BCC having made provision to pay Walk–In's claim. This breach caused damages to BCC of $900,000 because that money was no longer available to pay Walk–In's claim. As the judgment creditor here, Walk–In can enforce Faye Breuer's liability to BCC. Thus, she is liable to BCC for that amount and, as BCC's judgment creditor, Walk–In is entitled to a judgment for the use and benefit of that $900,000.

**C. Alter Ego**

■ Because a judgment creditor cannot garnish sums which the judgment debtor itself could not obtain from the garnishee, it is unclear whether assertion of the alter ego doctrine is proper in a garnishment proceeding. No Colorado court has ruled on this question and courts from other jurisdictions differ. *Compare, John Julian Constr. Co. v. Monarch Builders, Inc.,* 324 A.2d 208 (Del.1974), *with, Southern Environmental Group, Inc. v. Rosebud Landscape Gardeners, Inc.,* 196 Ga.App. 392, 395 S.E.2d 913 (1990). Here, it is questionable at best that BCC could sue Faye Breuer directly to disregard its own

corporate existence. However, even assuming that Walk–In can assert the alter ego doctrine in this proceeding, I decline to pierce the corporate veil.

It is axiomatic that the liability of a corporation's shareholder is limited to the amount of her investment. Because the law views a corporation as a legal person separate from its owners, corporate creditors are generally limited only to the assets of the corporation. The alter ego doctrine is a limited means by which corporate creditors can sue to disregard the corporate entity and hold stockholders personally liable for corporate debts. *Rosebud Corporation v. Boggio*, 39 Colo.App. 84, 561 P.2d 367 (1977).

> To establish the alter ego doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

*Fink v. Montgomery Elevator Co.*, 161 Colo. 342, 421 P.2d 735, 739 (1966). The burden of proof is on the person seeking to establish the exception. *Rosebud Corporation*, 561 P.2d at 371.

Faye Breuer caused capital to be transferred into and out of BCC, seemingly at random, and with very little formality. Faye Breuer also used BCC to trade for her own account and she paid some BCC expenses with her own funds. BCC was a close corporation with but a single shareholder. BCC was at times operated informally and the sole shareholder dominated the board of directors.

However, BCC had a life of its own—it had customers, employees, independent contractors, branch offices, and successfully completed one public offering. It filed with the IRS forms W2 and 1099 for its employees and independent contractors. Throughout its existence, BCC was registered and in good standing with the NASD as a distinct and independent corporation. Thus, although Faye Breuer occasionally used BCC as her own instrumentality, the corporation was not *merely* her own instrument. *See, Skidmore, Owings & Merrill v. Canada Life Assurance Co.*, 706 F.Supp. 758, 761 (D.Colo.1989), *aff'd.*, 907 F.2d 1026 (10th Cir.1990). Moreover, poor record-keeping, lack of attention to all formalities, and board dominance, alone does not mean that the corporate entity must be disregarded. *Contractors Heating and Supply Co. v. Scherb*, 163 Colo. 584, 432 P.2d 237 (1967).

I cannot say that the separate personalities of BCC and Faye Breuer ceased to exist. BCC kept its own bank accounts, employed its own accountants, filed its own tax returns, had a board of directors that conducted meetings, kept minutes and other records, and filed numerous audited and unaudited financial reports with the SEC and NASD. Although Faye Breuer caused the transfer of substantial capital into and out of BCC, each transaction was the subject of a corresponding board of director's meeting memorialized by appropriate minutes. Further, Faye Breuer did not commingle her funds with BCC's funds.

 Finally, disregard of the corporate entity is not necessary to prevent injustice. In any case where a corporate creditor will go unsatisfied if he cannot reach a shareholder, it could be said that recognition of the corporate form would be unjust. However, the law treats corporations as separate persons precisely to shield a shareholder from individual liability. Therefore, "injustice" in the context of the alter ego doctrine requires a showing of manifest abuse of the corporate form or intent to use the corporation as a shield for fraud. *See e.g., Ward v. Cooper*, 685 P.2d 1382, 1383 (Colo.App.1984), (trial court found that defendant used corporation to avoid his personal liability); *LaFond v. Basham*, 683 P.2d 367, 369 (Colo.App.1984), (trial court found that defendant received preferential payment of his notes when corporation was insolvent).

Here, plaintiff presented no evidence that Faye Breuer entered into the Walk–In underwriting intending to use BCC's corpo-

rate form to shield her from personal liability or that she abused the privilege of separate corporate existence. Until the December 30, 1986 judgment, BCC was solvent and there was no evidence that Walk–In was promised that the Breuer's assets stood behind BCC.

Accordingly, under the circumstances of this case, even assuming that the alter ego doctrine may be applied via garnishment, I conclude that plaintiff has failed to prove by a preponderance of the evidence that Faye Breuer was BCC's alter ego.

■ Walk–In also seeks to hold G.W. Breuer liable as an alter ego of BCC even though he was not a shareholder. *See, Labadie Coal Co. v. Black,* 672 F.2d 92, 97 (D.C.Cir.1982). Colorado has never applied this doctrine against a person who was not a shareholder, and I will not do so here. Even if I were to extend the doctrine to a person who dominates a corporation without being a shareholder, director, or officer, I conclude that G.W. Breuer was not the alter ego of BCC.

### D. *Fraudulent Transfers*

■ Colorado allows a judgment creditor to litigate questions of fraudulent transfers from a debtor to a garnishee in a garnishment proceeding. *Jones v. Langhorne,* 19 Colo. 206, 34 P. 997 (1893). This is an exception to the general rule that a creditor can only maintain a cause of action against the garnishee if the debtor could have done so. *Id.* Before a transfer of corporate assets can be set aside or a money judgment entered, however, a plaintiff must show that both the transferor and the transferee had the intent to defraud, hinder or delay creditors. C.R.S. § 38–10–117; *United States v. Morgan,* 554 F.Supp. 582 (D.Colo.1982), (collecting Colorado case law). The requisite intent may be shown by circumstantial evidence. *Id.* Under this statute, Walk–In is entitled to creditor status from the date of BCC's breach of the underwriting agreement. *Thuringer v. Trafton,* 58 Colo. 250, 144 P. 866 (1914).

■ Here, the transferor was BCC and the transferees were Faye and G.W. Breuer. This is not a case where a trans-

fer was made between spouses and, therefore, the burden of proof remains on Walk–In to establish the intent to defraud, hinder or delay. *Morgan,* 554 F.Supp. at 586.

Plaintiff has produced no direct evidence of intent to defraud, hinder or delay. The circumstantial evidence shows only that the parties knew of Walk–In's pending lawsuit when the transfers were made. However, Faye Breuer believed that BCC would win the New York lawsuit and that BCC would be a profitable going concern into the foreseeable future. Indeed, two days after one of the alleged fraudulent transfers, the withdrawal of the subordinated loan funds, BCC received an infusion of capital then worth more than $4 million. Although, this capital was later withdrawn, but BCC had approximately $700,000 remaining in net capital. As to the repayment of the temporary subordinated loan into the Breuer's joint of line of credit, the mere fact that Faye Breuer breached the loan agreement does not establish the requisite intent to set aside the transfer.

Plaintiff has not proved that any post–Walk–In judgment transfer was without consideration or made to one not a bona fide BCC creditor. Even though I conclude below that Faye Breuer breached her fiduciary duty to the corporation and its creditors when she transferred sums to herself, she then believed that the transfers were proper and in satisfaction of a genuine debt owed her by BCC. The mere fact that the transferees knew of the Walk–In judgment does not alone show intent to defraud, hinder, or delay.

I conclude that the evidence fails to establish that any transfer of BCC's assets was made with intent to defraud, hinder or delay its creditors.

### E. *Director Liability*

Plaintiff asserts two garnishment claims against Faye Breuer in her capacity as a director of BCC. First, Walk–In contends that she is liable under the Colorado Corporate Code, C.R.S. § 7–5–114, for distribution of corporate assets without providing for creditors. Second, plaintiff asserts that

under the common law, as a director of an insolvent corporation, she is deemed to be a trustee for it and its creditors and, as such, owed a duty to the corporation and its creditors not to divert corporate property for her own benefit. *See, Crowley v. Green,* 148 Colo. 142, 365 P.2d 230 (1961); *Rosebud Corporation,* 561 P.2d at 372; *Gaskins v. Bonfils,* 79 F.2d 352 (10th Cir. 1935).

■■■■ Under either theory, the cause of action to recover corporate assets wrongfully distributed runs to the corporation itself for its own use or for the benefit of creditors. C.R.S. § 7–5–114; *Crowley,* 365 P.2d at 233. Therefore, garnishment is an appropriate proceeding in which to litigate these issues.

A director is personally liable for any distribution of assets contrary to any the provisions of the corporate code. C.R.S. § 7–5–114(1). Plaintiff argues that Faye Breuer violated §§ 7–5–114(1)(c), 7–6–102, and 7–8–105. Section 7–5–114(1)(c) imposes liability on directors who distribute assets without making provision for creditors during liquidation of the corporation. Because BCC was not in liquidation when it distributed assets to Faye Breuer, this section was not violated. Section 7–6–102 only prohibits corporations from redeeming their own shares when insolvent. The transfers to Faye Breuer were not for redemption of her stock, so this section was not violated. Section 7–8–105 prohibits the distribution of corporate assets until all creditors are paid, but only applies after the corporation has filed a statement of intent to dissolve. Because BCC never filed this statement, this section was also not violated.

Under the common law, Faye Breuer may be liable for preferential distributions of corporate assets to herself or for her benefit after BCC became insolvent. *See, Crowley,* 365 P.2d at 232. BCC was solvent until December 30, 1986. Accordingly, I will not consider any distributions before that date.

■■■■ To establish a director's liability under the common law, a plaintiff need not show intent to defraud, hinder or delay creditors. *See, Security National Bank v. Peters, Writer & Christensen,* 39 Colo. App. 344, 569 P.2d 875 (1977); *see also, Rosebud Corporation,* 561 P.2d at 372. If a corporation is insolvent and its director distributes assets to herself in preference to other creditors, then that director is personally liable for the amount of the distribution. *See, Collie v. Becknell,* 762 P.2d 727 (Colo.App.1988). This liability results even if the director is also a creditor of the corporation. *Epcon Co. v. Bar B Que Baron International, Inc.,* 32 Colo.App. 393, 512 P.2d 646 (1973).

■■ BCC's director, Faye Breuer, distributed $180,830 to herself in preference over Walk–In, a BCC creditor, after BCC became insolvent upon entry of the New York judgment on December 30, 1986. Therefore, I conclude that Faye Breuer is liable for the full amount of assets she distributed to herself after BCC's insolvency.

As to all other distributions of BCC assets after insolvency, plaintiff has not proved that the money and securities went to persons who were not bona fide creditors. Because a director can prefer one third-party creditor over another, Faye Breuer is not liable for any post-judgment distribution to persons other than herself. *See, Skidmore, Owings & Merrill,* 706 F.Supp. at 761. This conclusion does not change merely because some of BCC's creditors were members of Faye Breuer's family.

■■ Finally, Faye Breuer owes BCC $33,571.50 on account. Under ordinary principles of garnishment law, she is personally liable to BCC's creditors for this amount. C.R.C.P. 103 § 4.

Accordingly, IT IS ORDERED THAT:

(1) Final judgment shall enter in favor of defendant Breuer Capital Corporation and against garnishee Faye Breuer for $1,114,-401.50, plus interest from the dates of the wrongful distributions (February 22, 1984—$600,000, May 1984—$200,000, August 1984—$100,000, January 2, 1987—$70,615, and January 9, 1987—$143,786.50),

for the use and benefit of plaintiff Walk–In;

(2) Final judgment shall enter in favor of garnishee G.W. Breuer and against defendant.