**WALK–IN MEDICAL CENTERS, INC.,**
**Plaintiff-Appellee,**

v.

**BREUER CAPITAL CORP.,**
**Defendant-Appellant.**

**No. 991, Docket 87–7088.**

United States Court of Appeals,
Second Circuit.

Argued April 2, 1987.
Decided May 5, 1987.

Peter R. Silverman, New York City, N.Y., for defendant-appellant.

Michael S. Press, New York City (Whitman & Ransom, of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, TIMBERS and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

In January 1984, appellant Breuer Capital Corp. ("Breuer") executed a firm commitment underwriting agreement, in which Breuer contracted to make a public offering of appellee Walk-In Medical Center's ("Walk-In") stock. Shortly thereafter, Breuer unilaterally terminated the underwriting agreement, claiming that it was justified in doing so because of "adverse market conditions." Following a four-day bench trial, Judge Miriam G. Cedarbaum held that Breuer had not been justified in breaching the underwriting agreement, and entered judgment for Walk-In in the amount of $3,298,400.55 (the contract price of the Walk-In stock plus prejudgment in-

terest). We affirm the decision of the district court in all respects.

## BACKGROUND

Walk-In Medical Centers, Inc., is a Florida corporation engaged in the business of establishing and administering out-patient centers for non-emergency medical treatment. Breuer Capital Corp., a Colorado corporation, is an investment banking firm and broker-dealer, registered with the Securities and Exchange Commission.

The president of Walk-In, George Resch, was interested in making an initial public offering of Walk-In shares, and commenced negotiations with Breuer in early 1983. On August 11, 1983, Breuer executed a letter of intent to act as the managing underwriter in connection with a proposed firm commitment public offering of 500,000 shares of Walk-In common stock.

On January 18, 1984, Breuer and Walk-In executed the firm commitment underwriting agreement. Under this agreement, Breuer agreed to purchase 500,000 shares of Walk-In common stock at $5.40 per share, with an option granted to Breuer to purchase up to an additional 75,000 shares at the same price, to cover over-allotments. Breuer agreed to make a public offering of the Walk-In stock. The closing date of the agreement was originally set for January 30, but on January 23, the parties agreed to move the closing date up to January 25, 1984.

The underwriting agreement also contained what is known in the securities trade as a "market out" clause, in ¶ 10(b), which provided:

> You [Breuer] shall have the right to terminate this agreement at any time prior to the closing date (i) if any domestic or international event or act or occurrence has materially disrupted, or in your opinion will in the immediate future materially disrupt, securities markets; or (ii) if trading on the New York Stock Exchange, the American Stock Exchange, or in the over-the-counter market shall have been suspended, or minimum or maximum prices for trading shall have been fixed, or maximum ranges for prices for securities shall have been required on the over-the-counter market by the NASD or by order of the Commission or any other government authority having jurisdiction; or (iii) if the United States shall have become involved in a war or major hostilities; or (iv) if a banking moratorium has been declared by New York State or federal authorities; or (v) if a moratorium in foreign exchange trading by major international banks or persons has been declared; or (vi) if the company or any of its future subsidiaries shall have sustained a loss material or substantial to the Company and its subsidiaries, if any, taken as a whole by fire, flood, accident, hurricane, earthquake, theft, sabotage or other calamity or malicious act which whether or not such loss shall have been insured, will, in your opinion, make it inadvisable to proceed with the delivery of the Shares; or (vii) if there shall have been such change in the conditions or prospects of the Company and its subsidiaries, if any, taken as a whole, or *such adverse market conditions as in your judgment would make it inadvisable to proceed with the offering, sale and delivery of the shares* (emphasis added).

At approximately 3:00 p.m. on January 18, 1984, Walk-In's SEC registration statement became effective, and Walk-In stock began to trade, opening at $6.00 per share. Between Wednesday, January 18 through Monday, January 23, the price of Walk-In stock traded down to approximately $4.00 per share, losing almost one-third of its initial value of $6.00 per share. During the week immediately preceding the Walk-In public offering, the Dow Jones Industrial Average had fallen from a high of 1295.44 on January 10, to 1269.37 at the close of trading on January 18. By the close of trading on January 23, the Dow had fallen to 1244.45, a decline of approximately 25 points since the day of the Walk-In offering.

On the afternoon of January 23, Faye Breuer, the president of Breuer, informed George Resch that Breuer was exercising its right to terminate the underwriting pur-

suant to ¶ 10(b)(vii) of the agreement—the "market out" based on "adverse market conditions." Breuer confirmed its termination by letter and telegram the following day.

Walk-In commenced this action against Breuer in February 1984. In November 1984, Breuer moved for summary judgment, asserting that there were no disputed issues of fact and that Breuer was entitled to judgment as a matter of law, because it had properly terminated the underwriting agreement due to adverse market conditions. Walk-In, in turn, cross-moved for summary judgment in December 1984.

On February 24, 1986, Judge Robert L. Carter denied both summary judgment motions. Judge Carter found the phrase "adverse market conditions" to be facially ambiguous, because it was susceptible of more than one reasonable interpretation. Furthermore, since the parties themselves urged radically different interpretations of the phrase, Judge Carter held that the meaning of "adverse market conditions" was a genuine issue of material fact requiring a trial.

Accordingly, the case was tried before Judge Cedarbaum, who announced her decision from the bench on December 30, 1986. After stating her findings of fact, Judge Cedarbaum concluded:

> I am satisfied, after listening to all of the testimony and weighing the credibility of the witnesses, that Mrs. Breuer was worried that she would not get paid by those who had made commitments to purchase the Walk-In shares, and that the defendant's decision to cancel the underwriting was not based on an evaluation of general market conditions but on the decline in the price of the aftermarket of Walk-In stock.[1]
>
> I am also satisfied that, under any reasonable interpretation, a decline in the aftermarket price of Walk-In's stock does not constitute "adverse market conditions" within the meaning of paragraph 10(b)(vii) of the firm commitment underwriting agreement in this case.

The district court awarded damages to Walk-In under § 8-107 of the New York Uniform Commercial Code, in the amount of $2,610,000 (the contract price of the Walk-In shares less $90,000 of expenses to which Breuer was entitled), plus prejudgment interest of $688,400.55. 651 F.Supp. 1009.

## DISCUSSION

### I. *The denial of Breuer's summary judgment motion*

Breuer first contends that Judge Carter erred in denying its motion for summary judgment. Breuer asserts that the meaning of "adverse market conditions" in the underwriting agreement is clear and unambiguous, and encompasses "any unfavorable decline in securities markets." According to Breuer's interpretation, the 25 point drop in the Dow between January 18–23, 1984, coupled with the decline in value of Walk-In stock, entitled Breuer to terminate the underwriting agreement as a matter of law.

Judge Carter did not agree that the phrase "adverse market conditions" was clear and unambiguous. Indeed, he denied Breuer's motion for summary judgment on the ground that the phrase was ambiguous, and that its meaning had to be decided by the trier of fact.

> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968) (citations omitted).

The determination of whether a contract term is ambiguous is a threshold question of law for the court. *See Tokio Marine and Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d

---

1. The "aftermarket" of a stock is the market that develops after the initial public offering.

Cir.1980); *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982). Therefore, we are not constrained by the "clearly erroneous" standard in reviewing Judge Carter's conclusion, and we review his determination *de novo*. We nevertheless conclude that the phrase "adverse market conditions" is susceptible of more than one reasonable interpretation, for the same reasons Judge Carter outlined in his decision.

Breuer, in support of its contention that "adverse market conditions" refers to *any* unfavorable market decline, cited *Funk & Wagnalls New Comprehensive Dictionary of the English Language*, which defined "adverse" as "unpropitious" or "detrimental." Walk-In, on the other hand, argued that "adverse market conditions" meant an "unforseeable and extraordinary" decline in securities markets, citing *Webster's New International Dictionary*, which defined "adverse" as "calamitous."

Judge Carter correctly observed that Breuer's proposed interpretation of "adverse market conditions" was reasonable, because it accorded with the literal meaning of "adverse." He also was correct in determining that, in the context of the entire underwriting agreement, Walk-In's interpretation was reasonable. The other six "market outs" listed in ¶ 10(b) refer to very serious disruptions either in the securities markets in general or in Walk-In's own business. If "adverse market conditions" were interpreted to mean *any* unfavorable market decline, all the "market outs" except for 10(b)(vi), which concerns the status of Walk-In only, would be encompassed by 10(b)(vii), and there would have been no need to enumerate them. Moreover, if Breuer were entitled to terminate the agreement due to *any* unfavorable market decline, the concept of a "firm commitment underwriting" would be rendered illusory.

█ Because the term "adverse market conditions" was susceptible of at least two reasonable interpretations, Judge Carter correctly determined that the term's meaning was a genuine issue of fact, and properly denied Breuer's motion for summary judgment. *See Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir.1975).

## II. *The judgment in favor of Walk-In*

At the trial of this action, Judge Cedarbaum admitted evidence of custom and usage in the securities industry, as well as evidence of the parties' intent, in order to interpret the phrase "adverse market conditions."

█ Evidence of trade usage was properly admitted pursuant to New York Uniform Commercial Code § 2–202, which authorizes the use of such evidence to explain a contract term, whether or not the term has been found to be ambiguous. *See id.*, Official Comment 1(c). Evidence of the parties' subjective intent was also properly admitted, in light of Judge Carter's preliminary determination of ambiguity. *See Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 996 (5th Cir.1983) (applying New York law) (evidence of subjective intent is admissible only where court has determined that contract is ambiguous); *see also Surlak v. Surlak*, 95 A.D.2d 371, 375, 466 N.Y.S.2d 461, 466 (2d Dept. 1983).

After hearing all the evidence, Judge Cedarbaum found that Breuer had not terminated the underwriting agreement due to general market conditions, but rather due to the decline in price of Walk-In's stock. She observed further that the decline in price of a single stock could not, under any reasonable interpretation, be considered "adverse market conditions." Therefore, the district court did not need to define "adverse market conditions" in this case.

█ There was ample evidence in the record to support a finding that the sharp decline in Walk-In's price was the primary reason Breuer aborted the underwriting. The evidence included Faye Breuer's trial testimony that on January 23, 1984, she received numerous phone calls from individuals who had previously agreed to purchase Walk-In shares. These individuals expressed concern over the declining price of the security, and reluctance to go forward with their purchases. The district

judge inferred from this testimony that Breuer was afraid of losing money on the Walk-In deal, and terminated the agreement in order to avert any loss.

Furthermore, on January 18, 1984, when the Walk-In agreement was executed, the equity markets were already in a decline, yet Breuer was willing to proceed with the underwriting at that time. The court observed that the drop in the Dow Industrial index between January 18–23 was "neither drastic nor extraordinary," and that declines of a similar magnitude had occurred many times in recent years. Indeed, during the period that Walk-In was trading, other equity underwriting was successfully taking place in the over-the-counter market. All these facts, the court concluded, made it more likely that Breuer terminated the agreement because of Walk-In's poor showing, rather than because of generally adverse conditions in the securities markets.

Finally, the district court admitted testimony which Mrs. Breuer had given before the Securities and Exchange Commission in February 1984, in connection with its investigation of the Walk-In underwriting. She testified, among other things, that her understanding of the phrase "adverse market conditions" was a market in which everyone wanted to sell their shares, no one wanted to buy, and everyone was losing money.

Mrs. Breuer's understanding of the term was reinforced by George Resch, who testified about a meeting between the parties on August 10, 1983, to discuss the letter of intent, which also contained the phrase "adverse market conditions." According to Resch, he asked if the phrase would have encompassed a recent 20–point decline in the market, and Mrs. Breuer assured him that the term referred to a market in which underwriters could not sell their shares.

Based on our review of all the evidence, we cannot conclude that the district court's findings of fact were clearly erroneous. The court properly concluded that Breuer terminated the underwriting because of Walk-In's sharp decline, and not because of any general market conditions. Therefore, we affirm the judgment in favor of Walk-In.

### III. *Calculation of damages*

Finally, Breuer claims that the district court improperly awarded damages under § 8–107(2) of the New York Uniform Commercial Code. Section 8–107(2) provides an alternate measure of damages to a seller of securities: it permits the seller to recover the contract price of the securities where the purchaser has wrongfully failed to pay for them.

This section departs from the official text of § 8–107 of the Uniform Commercial Code; the automatic alternative of an action for the price is a rule peculiar to New York. *See* N.Y.U.C.C. § 8–107, Practice Commentary (McKinney 1964) (section "reliev[es] the seller of securities delivered or tendered of any duty to mitigate damages by resale in the market prior to suing for the purchase price").

Breuer argues, however, that a 1982 amendment to § 8–107(2) limited the availability of this alternate measure of damages to cases where the buyer has actually accepted delivery of the securities.

Prior to the 1982 amendment, § 8–107(2) provided:

> Where, pursuant to a contract to sell or a sale, a security has been delivered or tendered to the purchaser, and the purchaser wrongfully fails to pay for the security according to the terms of the contract or the sale, *the seller may as an alternative to any other remedy recover the agreed price of the security.* This subsection does not affect the remedy of a seller if the security has not been delivered or tendered (emphasis added).

Chapter 928 of the Laws of New York of 1982, § 6, amended the italicized portion of the section as follows:

> [T]he seller may as an alternative to any other remedy recover the agreed price of (a) certificated securities accepted by the buyer; and (b) uncertificated securities which have been transferred to the buyer or person designated by the buyer.

The district court concluded, and we agree, that the 1982 amendment to § 8–107(2) was merely a technical one, and was not intended to effect any substantive change in New York's law of contract remedies. Chapter 928 of the Laws of New York of 1982 was an "act to amend the uniform commercial code and the business corporation law, in relation to certification of securities." Section 6 of that chapter was a technical amendment designed to conform § 8–107 of the Uniform Commercial Code to the overall statutory scheme involving certificated securities.

Although there are no other reported cases interpreting § 8–107(2) following the 1982 amendment, there is no affirmative indication in the New York Uniform Commercial Code or elsewhere, that the amendment was intended to modify New York's substantive contract law.

Therefore, the district court properly awarded damages to Walk-In in the amount of the contract price.

## CONCLUSION

In concluding, we wish to emphasize that the meaning of "adverse market conditions" in the context of a firm commitment underwriting remains an open issue. We note, however, that even a clause which was not ambiguous, but explicitly allowed for termination in the event of *any* unfavorable market decline, might still pose problems. The SEC has previously taken the position that market out clauses which permit an underwriter to terminate an agreement based on non-material events are inappropriate in the context of a firm commitment underwriting. *See The First Boston Corporation*, SEC No Action Letter No. 85–415 (Sept. 3, 1985). This position accords with the purpose of a firm commitment underwriting, in which the underwriter assumes the risk of loss on any shares which are not sold. *See, e.g., SEC v. Coven*, 581 F.2d 1020, 1022 n. 2 (2d Cir.1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979). We need not, of course, decide that issue in this case.

The decision of the district court is affirmed.