**PADDINGTON PARTNERS, Plaintiff,**

v.

**Jean–Louis BOUCHARD, Econocom Finance N.V., Econocom International N.V., Jefferies & Company, Inc., and Herbert A. Denton, Defendants.**

No. 88 Civ. 1381 (SWK).

United States District Court,
S.D. New York.

Feb. 9, 1990.

McDermott, Will & Emery, Washington, D.C., by Michael Friedlander, for plaintiff.

Morgan, Lewis & Bockius, New York City by Lisa Wager, John Vassos, for de-

fendants Jefferies & Co., Inc. and Herbert A. Denton.

KRAM, District Judge.

This action arises out of a complex securities transaction and subsequent tender offer. Plaintiff has pleaded violations under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), rule 10b–5, violations of civil RICO. 18 U.S.C. § 1961 *et seq.* and several state law claims. Plaintiff recently amended its complaint and defendants have filed recent motions to dismiss. This Court now considers plaintiff's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 on its contract claim against the Econocom defendants ("Econocom").

## Background

On October 26, 1987, plaintiff Paddington Partners sold 447,400 shares of the common stock of Decision Industries Corporation ("Decision") to defendant Econocom International. The transaction price was $4⅜ per share. A clause in the October 26th Agreement generally provided, under certain conditions, that if Econocom should announce a tender offer, merger or other acquisition of shares and later acquired or disposed of Decision shares at a premium, then Econocom would pay Paddington half of the difference between that premium price and $4⅜ on the 447,400 shares.

On October 27, 1987, the day after its Agreement with Paddington, Econocom announced a tender offer for the common stock of Decision at $6.00 per share. A bidding war for Decision ensued between Econocom and Onset Acquisition Inc. ("Onset"). Onset's offer of $11.00 per share topped Econocom's offer of $10.50, and Decision supported the Onset offer. On or about December 30, 1987, Econocom and Decision entered into an agreement under which Econocom agreed to withdraw its offer for shares of Decision, to transfer its shares at $11.00 per share to Onset pursuant to a second-step merger, and not to exercise dissenters' rights in connection with the merger. Pursuant to this agree-

ment Econocom transferred its Decision shares in a second-step merger in exchange for $11.00 cash per share on April 29, 1988. The actual transfer took place one hundred and eighty-six days after Econocom purchased Paddington's shares.

Econocom has refused to pay Paddington the $6⅝ per share differential that plaintiff seeks under the contract, making two arguments in support of this position. First, it contends that the contract requires that the actual "sale" of stock occur within the one hundred and eighty day period, a condition that was not met. Second, Econocom argues that the transfer for compensation via second-step merger was something other than a "sale" of stock under the Agreement.

Paddington added this breach of contract claim in the First Amended Complaint simply as a claim for the $6⅝ per share differential plus interest. Subsequent to the submission of the papers on this motion, however, Paddington has filed a Second Amended Complaint that further alleges that Econocom received additional compensation for its Decision shares in the form of $1,850,000 to withdraw its tender offer, as well as a worldwide marketing agreement from Decision. Second Amended Complaint at ¶¶ 108, 109. As Econocom has denied these allegations in its Answer to the Second Amended Complaint, see Econocom Answer at ¶¶ 108, 109, and since the Court has not received any submissions on these additional contentions, this opinion only concerns the allegations as briefed. The central contractual issue of whether the two "triggers" have been satisfied, however, remains the same under the Second Amended Complaint. The only new issues that will remain unresolved are those relating to whether this purported additional consideration was actually received, and whether it in fact was received as consideration for the Decision shares. The Court does not decide these issues in this opinion.

## Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party, Paddington, bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant seeks to do this by relying on the language of the contract, contending that it is unambiguous and susceptible to interpretation as a matter of law by the Court. The non-moving party, Econocom, then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

Plaintiff's allegation of breach and defendant Econocom's denial of contractual liability requires this Court first to consider whether the meaning of the contractual language is clearly discernible. The interpretation of an unambiguous contractual provision is a function for the Court. *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987); *Chimart Associates v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 233 (1986). Applying New

York contract law, "matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument." *Chimart Associates, supra,* 498 N.Y.S.2d at 346, 489 N.E.2d at 231 (quoting *Teitelbaum Holdings v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979)).

The contractual language at the center of this controversy provides in relevant part:

if it [Econocom] or any subsidiary or affiliate announces a tender offer for, or proposes a merger with or other acquisition of Shares of Decision within the next one hundred eighty (180) days after the date hereof, and purchases shares pursuant to such tender offer or otherwise acquires shares or consummates a merger with Decision, or sells the Shares, Econocom shall pay you 50% of the difference between $4⅜ per Share and the highest of the purchase price per share paid in the tender offer or other acquisition or pursuant to such merger, or received in such sale.

Plaintiff's 3(g) Statement at ¶ 2 (parties do not dispute the language, only its meaning). Paddington argues that the Agreement is clear on its face, and that liability was triggered by the tender offer by Econocom for Decision and the later transfer of stock by Econocom to Onset.

The Econocom tender offer was initiated only one day after the sale of Decision stock from Paddington to Econocom, and thus, was well within the one hundred and eighty day period. However, the actual transfer of the stock from Econocom to Onset by a second-step merger occurred on the one hundred and eighty-sixth day, thereby falling outside the triggering period. Nevertheless, Paddington contends that the contractual provision is unambiguous, and that the one hundred and eighty day period clearly only applies to the announcement of the tender offer, not the sale of stock. Paddington further argues that the clear language of the contract demonstrates that the parties intended the word "sale" to include any transfer of stock for consideration, whether or not it involved a merger. In opposition, defendant Econocom suggests two interpretations, neither of which would cause the Agreement to be triggered. First, it contends both the tender offer and the disposition of shares had to occur within the one hundred and eighty day period. Second, Econocom argues that the transfer by second step merger is something other than "sale," as intended by the Agreement.

1. The 180 Day Period

■ The parties refer to Econocom's tender offer for Decision and the subsequent transfer of those shares by merger to Onset as separate "triggers" that together trigger liability under the Agreement. Paddington and Econocom concur that the one hundred and eighty day period was intended to apply to the first trigger—the tender offer—and there is no dispute that this trigger occurred the day after the one hundred and eighty day period began to run. They also agree that the second trigger—the transfer of Decision shares from Econocom to Onset—took place on the one hundred and eighty-sixth day. Econocom, however, makes the argument that the time period also applied to this second trigger, and for this reason, that no contractual obligation accrued.

Econocom argues that the second trigger would be rendered entirely superfluous unless the one hundred and eighty day period also applied to it. *See* Econocom Memorandum in Opposition at 5. The Court does not agree because the specific differential—as measured by the difference between $4⅜ and any the later triggering sale—is only determined, and the contractual obligation only matures, when shares are sold. The Court also does not find the argument that failing to construe the time period to apply to the second trigger would result in an absurd or ridiculous provision. In support of this contention, Econocom argues that it would be liable even if the shares were transferred twenty years later. The Court, however, notes that by applying the time period to the second trigger, Econocom would have considerable control over the triggering of liability and could avoid liability simply by putting the

transfer off until after the one hundred and eighty day period. This interpretation would give Econocom substantial power to circumvent any liability under this clause, and the Court cannot make such a questionable interpretation where the language of the contract is clear.

Econocom attaches significance to the fact that the contractual reference to the one hundred and eighty day period and the second trigger are within the same sentence of the contract. As Paddington points out, the time period immediately follows and modifies the first trigger, not the second. The sentence at issue, as set out in the above excerpt, first identifies a series of acts constituting the first trigger, followed by the one hundred and eighty day limitation. This long sentence then continues, identifying the second trigger but without similarly applying the one hundred and eighty day limit. Even though both triggers are in the same sentence with the one hundred and eighty day term, the only reasonable interpretation of this language is that the time period applies to the first trigger solely. Econocom's suggestion that this time period applies to the second trigger does not comport with any reasonable grammatical construction of the contract.[1]

### 2. The Transfer of Decision Shares

■ The parties agree that Econocom transferred its shares to Decision pursuant to a second step merger after the merger of Onset and Decision. Econocom, however, has taken the position that the contract description of share disposition only included the sale of shares, not the transfer of shares under a second-step merger. Thus, the issue raised is whether the transfer of Decision shares to Onset in exchange for $11 per share as part of a second-step merger is a sale of stock.

Econocom held its Decision shares until the merger between Onset and Decision

occurred on April 29, 1988, at which time it transferred its shares to Onset at $11.00 per share pursuant to a second-step merger. *See* Second Amended Complaint at ¶¶ 48, 49. Econocom attaches some semantic significance to the absence of more specific contractual description of share disposition than the term "sale." According to Econocom, the transfer for value under this second step merger was not a sale. It then contends that *"By its [the contract's] own terms, no obligations under the Agreement were triggered if Econocom disposed of its stock in any way other than by sale."* Econocom's Opposition Memorandum at 2 (emphasis in original).

While this argument demonstrates some ingenuity, it is not convincing. Econocom provides absolutely no legal authority for the proposition that an actual transfer of shares for considerable value cannot be considered a sale of stock because the transfer is structured as a second-step merger. Instead, it relies on semantics and states that its interpretation is supported by the its December 30, 1987 agreement because it referred to the transfer as a transfer by second-step merger.

In contrast to Econocom's position, the common meaning of the word "sale" is broad and encompasses various types of disposition transactions. It is noteworthy that both New York law and certain federal securities law provisions also define "sale" broadly. Under New York Uniform Commercial Code Law, § 2–106, a sale is the passing of title between a buyer and seller for a price. *See* N.Y. Uniform Commercial Code Law § 2–106 (McKinney's 1964). The Securities Act of 1933 defines the terms "sale" or "sell" to "include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C.S. § 77b(3) (1975). The 1934 Securities Exchange Act states that "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U.S.C.S.

---

1. Econocom argues alternatively on this issue that this provision is ambiguous, and that the Court should deny summary judgment to later consider whatever extrinsic evidence might exist. *See, e.g., Heyman v. Commerce and Industry Insurance,* 524 F.2d 1317, 1320 (2d Cir.1975)

(where contract term is susceptible to two fairly reasonable interpretations, the Court should consider extrinsic evidence of intent). As stated above, the Court concludes that contract is susceptible to but one reasonable interpretation.

§ 78c (1983). Thus, authority supports the contention that this transaction was a "sale," and there is no legal authority presented to the contrary.

Whether a contract term such as this is ambiguous is a question of law. *See Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). The Second Circuit recently stated that

> A term is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the count of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."

*Curry Road Ltd. v. K Mart Corporation*, 893 F.2d 509, 511 (2d Cir.1990) (quoting *Walk-In Medical, supra*, 818 F.2d at 263). The *Curry Road* opinion provides an example of where summary judgment is inappropriate because of contractual ambiguities. In *Curry Road* the Court found an ambiguity in the combined effect of two lease provisions, one of which allowed the tenant K Mart to sublet while a second permitted the landlord to terminate the lease if the tenant discontinues store operation. Since the tenant could not vacate a store and sublease it without some discontinuance of store operation, the Court concluded that the contract was ambiguous as to how these clauses were intended to work together. In contrast, there is no apparent ambiguity here, and Econocom has not presented evidence that would either support its interpretation, or at the very least, support the contention that the term "sale" is ambiguous.

The shares at issue were transferred for valuable consideration, and there is no basis on which to conclude that this transfer is not a "sale" under this agreement. The Court therefore concludes that no genuine issue of material fact exists that would preclude the determination that the second trigger was satisfied.

Conclusion

Plaintiff's motion for partial summary judgment on count six is granted with regard only to the contract claim for the differential between $11.00 per share and $4⅜ per share as briefed by the parties. SO ORDERED.