# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 18, 2015 Session

## CHRISTOPHER A. PENDOLA, MD, PC, ET. AL. v. ASSOCIATED NEUROLOGISTS OF KINGSPORT, ET. AL.

### Appeal from the Law Court for Sullivan County (Kingsport)
No. C39960    Hon. E.G. Moody, Judge

---

### No. E2015-00685-COA-R3-CV-FILED-JANUARY 21, 2016

---

This is a breach of contract action in which the plaintiff filed suit after the practice refused to honor the buyout provision in the partnership agreement. The practice filed a counter-complaint, arguing that the plaintiff was liable for his share of the partnership's outstanding financial obligations. Following a bench trial, the court ordered the practice to remit payment. The practice appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Law Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Rick J. Bearfield, Johnson City, Tennessee, for the appellant, Associated Neurologists of Kingsport.

Weldon A. Patterson, Knoxville, Tennessee, for the appellee, Christopher A. Pendola, MD, individually and doing business as Christopher A. Pendola, MD, PC.

## OPINION

## I.    BACKGROUND

In 1996, Christopher A. Pendola, MD, doing business as Christopher A. Pendola, MD, PC ("Plaintiff") joined Associated Neurologists of Kingsport ("the Practice"), a general partnership of medical professional corporations engaged in the practice of neurology. He became a partner one year later. At that time, he signed a partnership agreement, which was later amended and restated on January 1, 2008.

In July 2008, the Practice entered into a ten-year lease agreement with Katherine Square Properties ("KSP") for office space. The lease was signed by the managing partner, Michael Dew, MD, in his partnership capacity. The lease required an annual rent of $216,594, payable monthly, plus a percentage of property taxes, insurance premiums, and common area maintenance charges for a period of ten years, beginning October 2009. The Practice remitted the monthly rental payments as a business expense.

On July 12, 2011, Plaintiff notified the Practice of his intent to withdraw following the expiration of a 180-day notice period. At that time, the Practice was composed of six professional corporations held by individual physician-neurologists, each of whom practiced through his corporation. Pursuant to the partnership agreement, Plaintiff requested his share of the Practice's accounts receivable and tangible assets, for a total sum of $142,289, as calculated by the Practice's accountant.

Plaintiff filed suit for breach of contract when the Practice refused to remit payment. The Practice responded with a counter-complaint for breach of contract against Plaintiff in his professional and personal capacity in the amount of $389,693.54, representing Plaintiff's share of rent for the remainder of the 10-year lease term, operating expenses, and medical supplies.[1] The Practice cited Section 19(a) from the partnership agreement in support of its claim. Section 19(a) provides as follows:

> The amounts payable under this Agreement to a former Partner shall constitute payment in full on the interest of such former Partner in the Partnership, and the former Partner shall have no right to receive any other payment from the Partnership including but not limited to distributions from the Partnership under Section 6 of this Agreement. Following the date of termination of the Partner's interest, such former Partner shall have [no] interest in the Partnership other than as a creditor, and the remaining or surviving Partners and the Partnership shall hold the former Partner harmless from and in respect of any and all claims, losses, expenses, obligations and liabilities arising after the effective date of such withdrawal and related to the Partnership. The former Partner shall hold the remaining or surviving Partners and the Partnership harmless from and in respect of its pro rata share of any and all claims, losses, expenses, obligations and liabilities arising from or relating to any claim based on the period of such Partner's membership in the Partnership.

---

[1] The Practice also initially denied that Plaintiff was entitled to a full partner's share of the accounts receivables and tangible assets. The Practice noted that only those who had been a partner for five years were entitled to a full share. The Practice asserted that Plaintiff's tenure began anew when the partnership agreement was amended in 2008. This argument was rejected by the court and is not advanced on appeal.

Plaintiff denied liability for any share of the Practice's current or future outstanding expenses.

Following the denial of competing motions for summary judgment, a hearing was held at which several witnesses testified. As pertinent to this appeal, Plaintiff testified that he and his wife incorporated his practice on October 2, 1997, to further insulate himself from personal liability. He became a partner one year after joining the Practice. At that time, he signed the 1990 partnership agreement, which was later amended and restated when Dr. Dew joined the Practice in 2008. He claimed that some sections were amended to allow Dr. Dew to join as a lateral hire with equal partnership rights. He noted that Section 19(a) had not been amended since his acceptance into the partnership. He believed that Section 19(a) was drafted, in part, to insulate the Practice from liability from an individual partner's malpractice. He denied knowledge of any claims made against the Practice during the course of his employment. He noted that Section 19(a) also provided a corresponding hold harmless provision to insulate former partners from liability for "claims, losses, expenses, obligations and liabilities" arising after the date of withdrawal. He asserted that rent and medical supplies, including BOTOX, were treated as office expenses and paid for by the Practice pursuant to Section 5, which provides as follows:

> Expenses and disbursements and all losses, costs, damages and liabilities incurred by the Partnership shall be paid out of the Partnership income or, if insufficient, out of Partnership assets. The Partnership shall maintain a reasonable reserve for Partnership expenses and other contingencies as the Partners shall from time to time establish, which reserve shall be appropriately reflected on the Partnership's books. If the Partners agree it is necessary, such reserve shall be funded by additional capital contributions or loans by the Partners pursuant to Section 4 of this Agreement.

Plaintiff identified at least three partners that had either withdrawn or retired from the Practice during his tenure. He recalled that each of the three partners received a buyout pursuant to the agreement and that their settlement was not offset by expenses.

Plaintiff identified the Practice's lease with KSP, dated July 30, 2008. He recalled that the lease was signed one year prior to their occupation of the property because the owner could not secure financing to build the property without a lease commitment. He claimed that he was not informed that the Practice signed a ten-year lease until April 12, 2010, more than a year after the lease was executed. He claimed that he never signed the lease in his personal or professional capacity.

- 3 -

Relative to BOTOX, Plaintiff testified that the Practice proactively purchased BOTOX for use in the office but that the Practice was later reimbursed for the toxin by the patient or the applicable insurance provider. He agreed that the medical supplier did not require immediate payment for the toxin and that the Practice usually remitted payment after it had been reimbursed. He explained that the delayed payment procedure allowed the insurance company to reimburse the Practice before payment was due.

Plaintiff testified that he and two other partners notified the six-partner Practice of their intent to withdraw around the same time. He provided that he worked through January 8, 2012. He claimed that he never received his pro rata portion of his monthly draw for January 2012, that the Practice refused to remit his buyout payment as calculated by the Practice's accountant, and that he was denied access to the property after his final day. He agreed that he received a bonus in December 2011 based upon the accounts receivable at that time. He claimed that his bonus did not include services rendered for the cost of BOTOX because the Practice paid for the product as an expense.

David Clark, a real estate developer and part-owner of KSP, testified that he first discussed leasing property to the Practice in 2008. The lease was a standard form that he modified to include an option to purchase. He required a ten-year lease because the building was constructed to suit the Practice's particular needs. The Practice was given approximately six months to review the lease prior its final execution. He recalled meeting with the partners on a frequent basis to discuss the lease because he could not procure financing without the Practice as a tenant. He recalled that discussions concerning the purchase of the property were ongoing even after the lease was signed.

Mr. Clark identified an email in which he advised the Practice that he would continue to enforce the lease agreement even though three partners filed a notice of intent to withdraw. He claimed that despite his ongoing claim for rent, he expressed his intent to assist the Practice and that he provided a $3,000 monthly reduction in rent for three months and allowed them to sublease a portion of the property. He agreed that the Practice continued to remit payment at a reduced rate but noted that he expected full reimbursement when possible.

Dr. Dew, shareholder of Blue Ridge Neurology Associates, and a current partner of the Practice testified that the partners were not initially aware of the specific terms of the lease agreement. He noted that the Practice had no intention of leasing the property but that Mr. Clark needed a lease agreement to procure financing to begin construction. He explained that the Practice intended to purchase the building but that the majority of the partners refused to acquiesce when they learned the bank required each partner to provide a personal and professional obligation to the lease. He noted that Plaintiff had

specific concerns about providing a personal obligation. He provided that three of the six partners attempted to purchase the property but could not obtain favorable financing.

Dr. Dew testified extensively concerning the Practice's financial problems following the withdrawal of three of the six partners. He claimed that the Practice had been unable to replace the former partners and that two of the partners had refused to acknowledge their financial obligations to the Practice. He noted that one partner had agreed to negotiate with the Practice in light of Section 19(a). He acknowledged that the Practice was able to sublease a portion of the property for six months and that they currently paid rent at a reduced rate. He claimed that he was unaware that Mr. Clark expected reimbursement for past rent.

Dr. Dew testified concerning the operating expenses he believed were incurred by the former partners prior to their withdrawal. He noted that the Practice disbursed bonuses based upon the accounts receivable in December 2011 prior to remitting payment for the outstanding balance owed to various medical suppliers for Botox. He agreed that Plaintiff was entitled to a buyout payment but asserted that the buyout should be offset by any outstanding obligations, namely rent, operating expenses, and the cost of medical supplies, owed to the Practice.

Robert Scott Macdonald, MD testified that his professional corporation was a current partner with the Practice. He recalled forming the practice with two other doctors in 1990. He agreed that partners had withdrawn or retired during his tenure and that he never attempted to obtain future rental payments from those who left the practice. He agreed that the departure of three partners had a devastating impact on the practice.

Following the presentation of the above evidence, the trial court entered an order, dated January 28, 2015, in which it held that the Practice breached the partnership agreement by failing to remit payment when the agreement did not entitle the Practice to recover future rent or expenses from departing partners. The court stated,

> If it had been the intent of the partners to obligate a departing partner for future rent, it could and should have been simply and precisely stated. As previously noted, the ambiguity is resolved against [the Practice] and in favor of [Plaintiff].

The court found that no claim related to the lease had been made against the Practice prior to Plaintiff's withdrawal and that the agreement specifically prohibited the Practice from treating a departing partner as a debtor. The court stated that rent paid for office space was treated as a partnership expense and that such expenses were governed by Section 5 of the agreement, which provides that expenses are paid out of partnership

income, not by departing partners. The court alternatively held that Plaintiff was released from liability when the Practice modified the lease and that any damages related to future rent would be speculative under the circumstances presented and in light of Mr. Clark's willingness to assist the Practice in meeting its obligations. The court provided the parties with ten days to file their respective computations of interest. Thereafter, the court adopted Plaintiff's proposed computation of interest and entered two amended judgments, both entered nunc pro tunc to January 28, 2015. This appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether the appeal should be dismissed as untimely.

B. Whether the trial court abused its discretion in its ruling on the admissibility of evidence.

C. Whether the trial court erred in finding that the Practice breached the partnership agreement.

D. Whether the trial court erred in finding that the requested damages were speculative.

## III. STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Because the trial court is in the best position to observe witnesses and evaluate their demeanor, we afford great deference to a trial court's credibility determinations. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

# IV.    DISCUSSION

## A.

As a threshold issue, Plaintiff asserts that this appeal should be dismissed as untimely because the Practice failed to file a notice of appeal within 30 days of the court's order granting his request for relief and denying the Practice's counter-complaint. He admits that the court entered two additional orders addressing the issue of interest in March 2015. He notes that the March orders were entered nunc pro tunc to January 28, 2015, and that the notice of appeal was filed on April 9, 2015. The Practice responds that the January order was not a final order capable of being redressed on appeal.

Rule 3 of the Tennessee Rules of Appellate Procedure provides, as follows:

(a) Availability of Appeal as of Right in Civil Actions.  In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right.  Except as otherwise permitted in Rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, *any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties*.

(Emphasis added).  Here, the record reflects that the January 2015 order, in which the court granted relief to Plaintiff and denied the Practice's counter-complaint, is not a final order.  The order provided, in pertinent part, as follows:

The respective parties shall have ten (10) days from the entry of this Judgment to file its respective computations of interest due on the date of the filing of this Judgment and the responding party shall have ten (10) days thereafter to file any objections.  The Court will then file an Amended Judgment to include the interest due.

The order is not final because the trial court specifically reserved the issue of interest for ruling on a later date and advised the parties that an amended judgment would be forthcoming.  The record further reflects that the court amended the January 2015 order on March 13, 2015, and March 17, 2015, to include Plaintiff's computation of interest. Accordingly, the Practice's notice of appeal, filed within 30 days of the March 2015 orders, was timely.

B.

The Practice claims that the trial court abused its discretion in overruling its objection to testimony concerning the interpretation of the hold harmless provision in Section 19. The Practice asserts that Plaintiff should not have been allowed to testify concerning his subjective understanding of the provision or discussions held with other partners about the meaning of the provision. The Practice notes that these discussions were not disclosed prior to trial. Plaintiff responds that the testimony was admissible.

Rulings on admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). We review the decision of the trial court to determine:

> (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222. If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White*, 21 S.W.3d at 223.

Here, the proffered testimony concerned Plaintiff's understanding of the pertinent provision of the contract at issue and whether the provision had been defined in conversations with other partners. To the extent that the evidence may have been inadmissible, any error in its admission was harmless when both parties were permitted to submit their interpretation of the provision for consideration. Tenn. R. App. P. 36(b).

C.

The Practice asserts that the trial court erred in interpreting the contract to prohibit treatment of Plaintiff as a debtor. The Practice also argues that the court erred by not enforcing the hold harmless provision in Section 19(a) to require payment of future claims for rent and outstanding operating expenses and medical supplies. Plaintiff responds that the court did not err in refusing payment for partnership expenses.

In order to prevail in a breach of contract case, a plaintiff must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC–Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996).

The court's initial task in construing the contract is to determine whether the language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn.2002). In general terms, an ambiguity occurs where a word or phrase is capable of more than one meaning. *Campora v. Ford*, 1124 S.W.3d 624, 629 (Tenn. Ct. App. 2003) (citing *Walk-in Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)). However,

> [a] word or expression in the contract may, standing alone, be capable of two meanings and yet the contract may be unambiguous. Thus, in determining whether or not there is such an ambiguity as calls for interpretation, the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph. The language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

*Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 412-13 (Tenn. Ct. App. 2011) (internal citation and quotation omitted). If the language of a contract is ambiguous, the ambiguity must be construed against the drafter of the contract. *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

Here, the pertinent provisions of the partnership agreement provide as follows:

**5. Allocation of Profits and Losses**

\* \* \*

> Expenses and disbursements and all losses, costs, damages and liabilities incurred by the Partnership shall be paid out of the Partnership income or, if

- 9 -

insufficient, out of Partnership assets. The Partnership shall maintain a reasonable reserve for Partnership expenses and other contingencies as the Partners shall from time to time establish, which reserve shall be appropriately reflected on the Partnership's books. If the Partners agree it is necessary, such reserve shall be funded by additional capital contributions or loans by the Partners pursuant to Section 4 of this Agreement.

\* \* \*

## 18. Amounts Due on Termination of Interest of a Partner

(a)     In the event of the death or retirement of a Partner, or a Partner's mandatory withdrawal due to disability, the Partnership shall pay to the former Partner, or to such former Partner's legal representative, an amount (without interest) equal to the sum of:

   i.     Such Partner's share of the accounts receivable of the Partnership, which share shall be based on the historical collection ratio for the Partnership (such collection ratio shall be as determined for the Partnership as a whole and not for the withdrawing Partner) for the previous 24 months prior to terminating his interest in the Partnership. . . . Payment for accounts receivable shall be paid the withdrawing Partner within two years from the date of withdrawal, plus

   ii.     Such Partner's share of the tangible assets of the Partnership, which share shall be valued at book value of such tangible assets, as of the effective date of withdrawal, plus 50% depreciation. For this purpose, book value shall be calculated by the independent accountant or other financial adviser regularly employed by the Partnership and such determination shall be final. Payment for tangible assets shall be made to the withdrawing Partner within six months after the effective date of withdrawal; MINUS

   iii.     The Partnership will pay for tail coverage on professional liability insurance for a retiring Partner. The amount paid will be deducted from the payout to the retiring Partner. All other Partner's withdrawing for any other reason shall be required to purchase tail coverage and the

withdrawing Partner shall provide evidence of the same to the Partnership. . . .

iv.      In the event a Partner voluntarily withdraws from the Partnership the Partnership shall pay him his share of the accounts receivables and tangible assets of the Partnership pursuant to Paragraphs (a)(i) and (a)(ii) and as otherwise adjusted by Paragraph (a)(iii), Paragraph (a)(v) and Paragraph (d) of this Section . . . .[2]

\* \* \*

## 19.  Interest in Partnership Following Withdrawal

The amounts payable under this Agreement to a former Partner shall constitute payment in full on the interest of such former Partner in the Partnership, and the former Partner shall have no right to receive any other payment from the Partnership including but not limited to distributions from the Partnership under Section 6 of this Agreement.  Following the date of termination of the Partner's interest, such former Partner shall have [no] interest in the Partnership other than as a creditor, and the remaining or surviving Partners and the Partnership shall hold the former Partner harmless from and in respect of any and all claims, losses, expenses, obligations and liabilities arising after the effective date of such withdrawal and related to the Partnership.  The former Partner shall hold the remaining or surviving Partners and the Partnership harmless from and in respect of its pro rata share of any and all claims, losses, expenses, obligations and liabilities *arising from or relating to any claim* based on the period of such Partner's membership in the Partnership.

(Emphasis added).

The parties agreed at trial that the partnership expenses included rent for office space, operating expenses, and the cost of medical supplies.  While the lease obligated the Practice to remit rental payments pursuant to the terms of a ten-year lease, we agree with the trial court that the rent was a monthly, recurring obligation as evidenced by Mr. Clark's willingness to reduce and defer rental payments.  The clear and unambiguous language of the agreement reflects that the Practice must absolve Plaintiff from liability from any *future* claims or expenses and that recovery from Plaintiff for any current

---

[2] Paragraphs (a)(iii), (a)(v), and (d) do not apply to Plaintiff.

expenses was limited to claims made against the Practice during Plaintiff's tenure. The Practice failed to present any evidence that a claim for *past* rent, operating expenses, or medical supplies had been made at the time of Plaintiff's withdrawal. Moreover, the agreement did not provide that Plaintiff's buyout was subject to an offset for the Practice's outstanding expenses at the time of withdrawal. Under these circumstances, we conclude that the court did not err in finding that the Practice breached the contract by failing to remit payment pursuant to the agreement.

D.

Having affirmed the trial court's ruling that the Practice breached the contract, this issue is pretermitted.

## V. CONCLUSION

The judgment of the law court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Associated Neurologists of Kingsport.

_____
JOHN W. McCLARTY, JUDGE